**BLOHM & VOSS AG, Plaintiff,**

v.

**PRUDENTIAL-GRACE LINES, INC.,
Defendant.**

Civ. A. No. 17959.

United States District Court,
D. Maryland.

June 20, 1972.

J. Cookman Boyd, Jr., and Sauerwein, Boyd & Decker, Baltimore, Md.,

Francis T. Carr, Douglas G. Brace, C. Stephen Barrett, III, and Kenyon & Kenyon, Reilly, Carr & Chapin, New York City, for plaintiff.

Robert A. Shelton, Baltimore, Md., George J. Harding, 3rd, George A. Smith, and Frank A. Follmer, Philadelphia, Pa., for defendant.

WATKINS, District Judge.

## GENERAL STATEMENT [1]

### 1. The Parties and Jurisdictional Aspects

This is an action for patent infringement brought by plaintiff Blohm & Voss AG, a German company having its principal place of business and shipyard at Hamburg-Steinwerder, West Germany. Plaintiff designs and constructs ships and equipment for ships at its yard.

The defendant, Prudential-Grace Lines, Inc. (Grace) [2] is a corporation of Delaware having its principal place of business in New York, N. Y. It operates a shipping fleet, including six ships known as the Santa Lucia class which periodically load and discharge cargo at the Port of Baltimore.

Plaintiff asserts that the heavy lift cargo gear installed on such ships infringes its patent in suit.

Sun Shipbuilding & Dry Dock Company of Chester, Pennsylvania (Sun), constructed the Santa Lucia class of ships and the heavy lift cargo gear installed on them. Sun is obligated to defend, indemnify, and hold Grace harmless on account of any charge of infringement by such cargo gear, including the expenses of litigation, and is paying for the services of defendant's counsel.

The action for infringement is based upon 35 U.S.C. sections 271 and 281. The jurisdiction of this Court is grounded on 28 U.S.C. section 1338(a). Venue is grounded on 28 U.S.C. section 1400(b).

Jurisdiction in respect of defendant's counterclaim for a declaration of invalidity of the patent in suit is grounded on 28 U.S.C. sections 2201 and 2202 as well as 28 U.S.C. section 1338(a).

### 2. The Patent in Suit

The patent in suit is U. S. Letters Patent No. 3,236,390 ('390) granted February 22, 1966, based upon patent application Serial No. 403,441 filed October 2, 1964 by H. F. J. Sprengel (Sprengel). Such patent application was a continuation-in-part of Sprengel's then co-pending U. S. patent application Serial No. 361,422 filed April 21, 1964, now abandoned.

The patent relates to ship's loading apparatus broadly referred to as cargo gear. The patent discloses gear comprising a long boom, pivotally mounted on the deck on the centerline of the ship, having boom head fitting(s) carried by the upper (or outer) end of the boom. The upper cargo [3] blocks are carried by such fittings.

The gear may be constructed in two variations—one using a single upper cargo block mounted on the fitting to swing in pendulum movement along one side of the boom, and a double pendulum variation having two upper cargo blocks located on opposite sides of the boom, pendulumly mounted on the fittings.

The patent is entitled to the April 17, 1964 filing date of German patent application St 21,981 in respect of the double pendulum type of the heavy lift cargo gear. The patent is entitled to the October 12, 1963 filing date of German application St 21,185 in respect of the single pendulum type of gear.

The above mentioned United States patent applications were assigned, and the patent was originally granted, to H. C. Stulcken [4] Sohn, also a company of Germany. In early 1966, plaintiff ac-

---

1. The paragraphs through "Damages and Relief Sought" closely follow the Joint Pre-Trial Memorandum of the parties.

2. The original defendant was Grace Line, Inc. By merger it has become Prudential-Grace Lines, Inc.

3. Variously described as "cargo", "purchase" or "lifting" blocks.

4. In German the "u" has an umlaut, often reproduced in English as "ue". For simplicity, the single letter "u" is used herein, except in direct quotations.

quired the business and assets of Stulcken, including the then-pending application S.N. 403,441, upon which the patent in suit was about to be granted. Plaintiff's ownership of the patent has been recorded in the Patent Office. There is no controversy regarding ownership of the patent.

3. The Contentions of the Parties

A. By Plaintiff, Regarding Infringement

Plaintiff contends that claims 1–3, 14, 15 and 18 of the patent are infringed by the heavy lift cargo gear installed and used on the Santa Lucia class of ships.

To the extent that defendant contends that there is no literal infringement of such claims by its cargo gear, plaintiff contends that the structure of such gear achieves the same result in the same way by the same means as the patented invention, and that any structural differences are obvious mechanical equivalents.

Plaintiff contends that the invention has been a commercial success based upon its technological merits. The gear is capable of handling exceptionally heavy loads, up to 250–300 tons. Two hatches (fore and aft) can be served by the gear alternately without dis-mantling or re-rigging the gear. By virtue of mounting the upper cargo block(s) to swing in pendulum fashion on one side of the upper end of the boom, in the case of the single pendulum, or on opposite sides in the case of the double pendulum, the movement of the boom from one hatch to another is simplified, thereby saving time and permitting the use of less skilled workmen. In the double pendulum construction, as is here in suit, two upper cargo blocks are mounted on fittings on opposite sides of the boom head. This additionally and optionally permits using only one upper cargo block to handle light loads (not exceeding 50% of normal capacity) at twice the normal lifting speed, although this is not disclosed in the specification nor claimed in the patent in suit.

Plaintiff contends that Sun is a real party in interest.

B. By Defendant, Regarding Invalidity

Defendant contends that the claims of patent '390 in suit are invalid on the following grounds:

1. The differences between the claimed subject matter and the prior art are such that the claimed subject matter as a whole would have been obvious at the time the alleged inventions were made to a person having ordinary skill in the art to which said subject matter pertains (35 U.S.C. section 103).

2. The claims in suit are invalid because the specification of the patent in suit does not contain a written description of the alleged invention, and of the manner of making and using it in the full, clear, concise and exact terms required by 35 U.S.C. section 112.

3. The claims in suit are invalid because they fail to particularly point out and distinctly claim the subject matter of the alleged invention (35 U.S.C. section 112); the claims call for structures incapable of performing their purported functions and call for inoperative structures.

C. By Defendant, Regarding Noninfringement.

Defendant contends that none of the patent claims in suit is infringed because each of said claims contains claimed structure which is not found in any of defendant's devices which are alleged to infringe.

D. By Defendant, Regarding The Estoppel Defense

Defendant contends that plaintiff knew that the claims in suit were too limited to cover the rigging configuration of defendant's allegedly infringing devices long prior to the allowance of the patent in suit, but failed to seek claims broad enough to read on said rigging configuration and only sought limited claims to implement its efforts to obtain the patent in suit and, therefore, is not entitled to any equitable assistance in construing the claims in suit to read on the allegedly infringing devices and is es-

topped from asserting said claims against said devices.

**E. By Defendant, Regarding Patent Misuse**

Defendant contends that plaintiff has misused its United States patent in suit by means of the license agreement with its exclusive United States licensee, MacGregor-Comarain Co., Inc. ("MacGregor"), both viewed alone, and as a part of a worldwide scheme by plaintiff to divide and allocate markets and suppress competition through similar licensing arrangements, all in violation of the anti-trust laws of the United States, in that plaintiff has:

1. Used the patent in suit to require MacGregor to pay royalties on various STULCKEN MASTS which are unpatentable in this country.

2. Used the patent in suit to tie in procurement of services and goods from plaintiff outside the scope of the patent monopoly.

3. Used the patent in suit to impose improper restrictions on the activity of MacGregor outside the scope of patent monopoly.

4. Used the patent in suit to improperly control unpatented products.

5. Imposed territorial and customer restrictions on MacGregor pursuant to a scheme, furthered by the MacGregor license and its other licenses worldwide, to divide and allocate markets for all two-hatch cargo boom equipment, patented and unpatented, and to monopolize the world market for such gear.

6. Bound MacGregor not to question the validity of plaintiff's patents.

**4. Damages and Relief Sought**

Plaintiff sought an adjudication that the patent is infringed, and an injunction permanently enjoining defendant from further infringement, by either the use of the heavy lift cargo booms installed on the Santa Lucia class of ships and/or future installations, and damages for past infringement. The amount of damages is not liquidated. Plaintiff has, however, agreed that the dismantling of Grace's ships would impose an in-equitable hardship, and if it is successful in this case will be content with money damages for past infringement, and an injunction only against new infringing installations.

Defendant seeks an adjudication that the patent in suit is not infringed and is invalid and void. Defendant further seeks a decree that the patent is unenforceable because of plaintiff's alleged acts of misuse and violations of the Federal antitrust laws and that plaintiff is estopped from asserting the patent against the defendant.

Both parties seek an assessment of costs and an award of reasonable attorneys fees.

## VALIDITY

*Statutory Provisions*

United States Code, Article 35, Section 282. "Presumption of Validity"

"A patent shall be presumed to be valid. The burden of establishing invalidity of a patent shall rest on a party asserting it."

■ The burden is a heavy one. Copease Mfg. Co. v. American Photocopy Equipment Co., 298 F.2d 772, 777 (7 Cir. 1961); Diamond International Corporation v. Walterhoefer, 289 F.Supp. 550, 554 (D.Md.1968); Grinnell Corp. v. American Monorail Co., 285 F.Supp. 219 (D.S.C.1967). This presumption is strengthened where two of the three patents relied upon by defendant were made of record by the Examiner, and where the remaining art relied upon by defendant was long known and is less pertinent. Chesapeake & Ohio Railway Co. v. Kaltenbach, 95 F.2d 801, 804 (4 Cir. 1938); Bowser, Inc. v. Richmond Engineering Co., 166 F.Supp. 68, 75 (E.D.Va.1958), modified on other grounds, 264 F.2d 595 (4 Cir. 1959).

Defendant's contention that the patent "slipped through" the Patent Office "like a greased pig", is picturesque but indecisive. Whether a tortuous process before the Examiner, who at last yields without explaining why, strengthens or weakens the presumption, has been ques-

tioned. Cook Engineering & Electronics, Inc. v. Hickory Foundry and Machine Co., 231 F.Supp. 271, 273 (W.D. N.C.1964); Aghnides v. F. W. Woolworth Company, 335 F.Supp. 370, 377 (D.Md.1971).

The "easy course" certainly eliminates any problem of file wrapper estoppel in connection with infringement.

Section 103: "Conditions for patentability; non-obvious subject matter" reads as follows:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

Section 112: "Specification" reads as follows:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set set forth the best mode contemplated by the inventor of carrying out his invention.

The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention. A claim may be written in independent or dependent form, and if in dependent form, it shall be construed to include all the limitations of the claim incorporated by reference into the dependent claim. An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

*The Factual Determination of Obviousness*

The criteria for the determination of obviousness under Section 103 have recently been reviewed by the Supreme Court in Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1965) where the Court said (pages 17–18, 86 S.Ct. page 694):

While the ultimate question of patent validity is one of law . . . the § 103 condition, which is but one of three conditions, each of which must be satisfied, lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy. See Note, Subtests of "Nonobviousness": A Nontechnical Approach to Patent Validity, 112 U.Pa.L.Rev. 1169 (1964).

### HISTORY OF TWO HATCH GEAR

From at least the end of World War II, many efforts were devoted to the development of gear that would permit one boom to serve two hatches, fore and aft, without re-rigging.[5] Sprengel has certainly been in the forefront of this work.

5. The recent development of containerized vessels, with little or no ship's gear, has slowed down, if not halted, the production of the gear about to be discussed.

About 1953, Sprengel developed so-called rotary-type gears, in one of which the boom was rotated by hand, and in another of which the head of the boom was mounted for rotation, and the lifting apparatus was hung from the boom head. At about the same time, he designed the so-called Falkenstein gear, which successfully served a fore and an aft hatch, but which required some re-rigging.

After reading an article on the Falkenstein, the owner of the Hansa line contacted Stulcken about the construction of gear of the capacity of at least 120 tons [6] to service two hatches without re-rigging. In return for such an undertaking, Hansa placed with Stulcken an order for an entire ship, contrary to its previously unbroken practice of having its ships built at another yard.

Sprengel worked on this project, first projecting a rotary-type gear, but he did not consider that it could handle loads as heavy as 120 tons. He [7] then conceived the design of the fork-type gear installed on Hansa's M/S Lichtenfels (PX 28; 9C; United States Patent No. 2,914,193, issued November 24, 1959).

This gear had the top of the boom formed in a "Y" or "fork" configuration, and the upper and lower cargo blocks were suspended from the crotch of the fork. When it was desired to swing the boom through the vertical plane to service a different hatch, the cargo blocks were brought together, a wedge on the top of the lower block fitting into a wedge-shaped claw in the bottom of the upper block, and the "composite block" swung as an "inverted pendulum" through the fork over the top of the boom.

The fork gear was an immediate commercial success, about 120 having been built prior to 1965 (PX 52, 52A); and defendant concedes that this design was a substantial contribution to the art (Tr. 184). In fact, defendant is rather fulsome in its praise of the fork-type gear—so that it may argue that the patent in suit is inferior to it; or at least no better.

There were and are, however, some deficiencies in the fork design. Care had to be taken that the upper and lower blocks were brought snugly together but that this was not overdone; the height and size of the blocks made visibility poor at night; and it was extremely difficult to swing the gear to an opposite hatch under list, or under open sea conditions.

Lehmann United States Patent No. 3,042,222 issued in July 1962, on an apparatus referred to during the trial as a "gallows" rig. It is heavily relied upon by defendant and will later be considered in detail.

Lehmann United States Patent No. 3,107,790 issued in October 1963, for gear having a rotatable boom head. Although cited in the statutory notice, it is not now relied upon in the argument on obviousness. Sparrow (Newport News) United States Patent No. 3,110,403, issued November 12, 1963, also involves the use of a rotary sleeve, and likewise is not being pressed by defendant.

Some eight years later, while on a trip, Sprengel turned his mind to a consideration of possible designs that would be better than the fork-type gear in speed and ease of operation and safety. The concept of the pendulum block of the patent in suit occurred over a period of five to ten minutes (Tr. 1011) and he completed substantially final drawings of the concept of the single pendulum in two days.[8] The general concept,

---

6. The largest rotary type built at the time of trial was 70 tons (PX 81).

7. The confusion in the listing in the Patent of two others with Sprengel as inventor will later be discussed.

8. Defendant urges that these relatively short periods of time indicate obviousness. The Court would be more inclined to attribute the result to one of those rare "flashes of genius", by a man who had already made substantial contributions through rotary and fork-type gear. In any event, "Patentability shall not be negatived by the manner in which the invention is made." (Title 35, § 103).

now apparently simple, was to hang the cargo blocks, pendulum fashion, from the upper end of the boom so that in every position of the boom the cargo blocks would be vertical, whether the boom was swung fore and aft, or laterally.

The initial concept was that of hanging the cargo blocks from only one side of the boom. Such a single pendulum—block gear was successfully installed on the Westphalia.[9] Shortly thereafter, in an endeavor to increase the lifting capacity of the boom, he hung cargo blocks on opposite sides of the boom—the double pendulum. Despite the commercial success of the Fork-Type construction, it was immediately superseded by the Pendulum-Block design.

In the specification of '390, the general nature of the invention is stated:

"This invention relates to a ship's loading apparatus. It relates particularly to a cargo boom for a ship. It relates more particularly to a cargo boom intended to be installed in through-swinging manner between uprights on a ship's deck to serve hatches both forward and aft of the boom mounting, and it relates still more particularly to a cargo boom of the kind described which has a pendulum purchase block fitting adapted to swing or be swung past the boom in either direction depending upon whether the boom is serving a forward or an aft hatch." [10]

There follows a reference to the fork-type gear and to its "operational shortcomings."

The specification then continues:

"For the accomplishment of the foregoing objects the present invention provides a cargo boom having at least one purchase block fitting at its upper end which is mounted to swing from side to side of the boom, that is, from forward to aft of the boom and vice versa, as a normal rather than an inverted pendulum, and which is provided with two turning heads each of which carries a guide sheave above the upper end of the boom proper. Specific embodiments of this invention include one in which the purchase block fitting is overhung on its pivot pin alongside the boom, another in which the boom is forked at its upper end with the purchase block fitting being pivotally mounted within the fork structure and thus adapted to swing through the boom, and another in which a pair of purchase block fittings are rotatively overhung along opposite sides of the boom.

"In the utilization of the present invention the hauling parts of a purchase tackle are led from a lower purchase block through passages in a novel fitting from which the purchase tackle and purchase block are suspended, to and over guide sheaves on this fitting, and from there either directly to guide sheaves in hollow rotating heads on top of the uprights between which the boom is mounted and between which it swings, or intermediately to another fitting, tackle, and block arrangement similar to the first. From the guide sheaves in the heads on top of the uprights, the hauling parts are led to guide sheaves within the uprights and thence out through

Sprengel's explanation is refreshingly simple. When asked if there was any particular event or occurrence which caused him to get started on the patent in suit, he replied:
"A. No, I think not.
"I can never explain—often they ask me, 'How did you come out with the fork type', and now the same way, 'How did you come to this idea?'
"You cannot explain it. You have it, or you don't have it.

"I did know what I could do, and at some moment, I would do it. And before that, there was no solution. That was with the fork type before, and now the same with the pendulum type." (Tr. 1010–1011).

9. Tr. 564–73. PX 42 is the motion picture of the successful testing of this gear.

10. Col. 1, lines 16–26.

slots in the walls of the uprights, going finally to the drums of two cargo winches.

"When the boom is swung back or forth between the adjacent uprights to serve an aft or a forward hatch, the hauling parts are carried over the top of the boom throughout its whole movement as the purchase block fitting is at all times oriented substantially vertically downwardly as a normal pendulum from its pivot point at or very close to the boom's upper end. Thus the hauling parts of the purchase tackle, led over the guide sheaves on the inventive pendulum purchase block fitting as aforesaid, do not interfere at all with the swinging through maneuver." [11]

Figures 1–12 set forth various embodiments of the invention.

Claims 1–3, and 14, 15 and 18 are in suit. Claims 1 and 14, set out below, will, in general, suffice.

"What is claimed is:

1) "The combination comprising (1) a ship's deck, (2) a cargo boom disposed above said deck, said cargo boom having an upper end and a lower end, (3) pivot mounting means for said cargo boom disposed between the lower end thereof and said deck, said mounting means permitting rotation of said cargo boom in a vertical plane to swing through between uprights, and (4) a purchase block fitting adapted to have an upper and a lower purchase block and associated purchase tackle suspended from it, said fitting being pivotally mounted on said boom near the upper end thereof in a manner permitting it to swing from side to side thereof as a normal pendulum in the direction of motion of said boom between uprights, and said fitting including guide means extending above the upper end of the boom which is adapted to receive the hauling parts of the purchase tackle

and direct each of the same toward an upright.

14) "The combination comprising (1) a cargo boom having an upper end and a lower end, (2) a head pin extending transversely from opposite sides of said cargo boom near the upper end thereof, and (3) a pair of purchase block fittings, each fitting adapted to have an upper and a lower purchase block and associated purchase tackle suspended from it, each fitting being pivotally mounted closely adjacent said cargo boom to swing from side to side of said cargo boom as a normal pendulum with said boom in substantially upright position, one fitting being so mounted on one extension of said head pin and the other fitting being so mounted on the opposite extension of said head pin, and each fitting including guide means extending above the upper end of said boom in upright position which is adapted to receive the hauling parts of the purchase tackle, and direct the same away from said boom."

Defendant challenges validity on grounds of obviousness and failure to claim an operative structure.

## OBVIOUSNESS

In its claim of obviousness, defendant relies upon shear legs, a boat davit, Sprengel's fork-type gear, and Lehmann's gallows-type design as prior art. The patents on the fork-type gear and gallows-type gear were cited of record in the prosecution of the patent in suit. The Lehmann gallows-type gear has never been installed in any vessel.

a. Old fork-type

Defendant expends a substantial portion of the section of its brief relating to obviousness to an argument that the fork-like structures embodied in Figures 10 and 11 of '390 are inferior to the older fork-type structure embodied in patent 2,914,193. Sprengel candidly ad-

---

11. Col. 1, line 69—col. 2, line 37.

mitted that it was the patent attorney who suggested that "we take in every variation" (Tr. 1410) and that the new fork rig while not impractical was approaching it. (Tr. 2696–7). However, in the '390 specifications it was asserted that the new fork rig was better than the single pendulum rig "for handling loads in the very high weight ranges",[12] but not as suitable when there would be frequent alternations between fore and aft hatches.[13] One other advantage of the "new fork" is that it is not necessary to remove the Flemish (cargo) hook for a swing through maneuver of the cargo boom, and that the cargo purchase can be employed to swing the boom through against an unfavorable trim.

In any event, this "new fork" gear has never been built or installed, and no claim for infringement has been made.

Defendant also strenuously argues that the double pendulum rig is not superior to the old fork rig.

Defendant cites no authority to support the proposition that a new, different and satisfactory way to accomplish a result is not inventive, because a different way had previously existed. Under this approach, if waste had previously been removed from gutters by manual sweeping into shovels, no invention would exist in mechanical removal, by sweepers and/or blowers or vacuum. The old fork gear did a commercially satisfactory job in view of devices then available. It was, however, superseded by the pendulum gear. Were it now, however, necessary, to establish the superiority of the pendulum gear over the old fork, the Court is of the opinion that this has clearly been done.

Defendant's main reliance, over public response, as to the equivalence or superiority of the old fork over the pendulum gear, is upon literature of plaintiff extolling the virtues of all of its gear; rotary, fork or pendulum. Surely defendant would have been unwilling to accept as proof of superiority of the pendulum gear the self-adulatory praise of plaintiff. The pragmatic supersedure of the pendulum over all other gears is the most persuasive proof possible, since it is related to business advantages, not advocacy. The advantages of a simple swing through as contrasted with lifting and coupling the upper and lower blocks, and eliminating the Flemish hook, is obvious. Defendant contends that the "modification" of the inverted pendulum in the old fork-type gear to a normal pendulum in '390 is obvious. However, in its brief on infringement (p. 28), defendant argues that a reversal of rotational elements is not an equivalent, citing Blaw-Knox v. Hartsville Oil Mill, 394 F.2d 877, 883, 884 (4 Cir.1968).

b. "Shear legs"—Knight's Modern Seamanship

Defendant relies upon plate 44 of Knight's Modern Seamanship (PX 14, PX 16). This old rigging system includes a pair of shear legs supporting a cargo purchase having a pair of upper and lower cargo blocks and an equalizing block between the upper cargo blocks. Fore and aft movement was not contemplated because there are no calculations to show the related stresses. *There is no pendulum block fitting because there is no boom.*

Bebler, an expert, whose deposition was taken by plaintiff, but who was not employed by plaintiff or its counsel [14] testified to some similarity in approach, the shear legs being the "simplest of elements—a pulley—known from the earliest time of man, to a rather sophisticated bearing-mounted assembly . . .[15] He further testified: [16]

"A. Most of us live on past experience, and while just for example this PX 14 may be used on shear legs, I personally had never seen it. To the best of my knowledge, we had never used a split load center line system with two

12. Col. 7, lines 34–35.

13. Col. 7, lines 47–50.

14. PX 123, p. 82.

15. PX 123, pp. 114–115.

16. PX 123, pp. 116–117.

winches hauling on it in any of our previous conventional heavy-lift rigging. I have no doubt somebody else thought of it but never developed the hardware to make it a completely useful thing. Once it is accomplished you can say, 'Oh, yes, the Egyptions used this same sort of rig with pulley and block and fall back in the mid-centuries,' so when you are saying it is something obvious, yes, it could have been, but apparently i⁺ was not, because it was not generally or well-accepted prior to that time, nor does it fall within my own experience to say that I have seen it tried with good, bad or indifferent results.

"Q. You had seen it tried?

"A. No. * * *

"It is a case of hindsight instead of foresight."

Defendant's expert, Stiglich, admitted that the shear legs device was not directed to cargo handling as such;[17] that the drawing was in error;[18] that he had never seen shear legs used for as much as 80 tons, and that additional blocks would be needed;[19] that the structure was not intended for repeated operation; and that he would not specify its use on ships.[20]

c. Boat davit—Ashe Patent 1,257,664 (PX 2).

Davits may loosely be considered as "devices in the nature of booms or cranes from which a life craft is lowered by means of cables, or other added lowering means, to the water."[21]

Note the emphasis on *"lowering"*. A cargo boom must, however, lower, raise, and transfer.

Sprengel would not characterize Ashe's davit arm as a boom; a cargo boom must not only move up and down, but to port and starboard.[22]

Bebler felt that Ashe's davit had no bearing on the invention in suit. It was designed for special purposes not applicable to heavy lift cargo gear.[23]

Although Stiglich testified that he thought that the pendulum was obvious in view of Ashe, the old fork, and Lehmann '222,[24] he admitted that Ashe was primarily related to lowering;[25] that if the cleat were placed as shown in the patent drawing, it would cause the line to wrap around the "boom";[26] and that a "fair lead" would be required.[27] After some apparent evasion,[28] he finally admitted that the hauling parts of the tackle in the Ashe patent were guided from the top of the davit arm down to another portion of the davit arm, and not guided away from the davit arm.[29] Claim 14 of '390 calls for guide means for directing the hauling parts of the purchase tackle "away from" the boom. While Stiglich referred to having seen one arm of the equivalent of the Ashe davit used, it was only to lift an undescribed load, which was pulled by a tag line to an open lower deck[30]—a far cry from a cargo boom lifting cargo out of or lowering it into, a hold, and capable of swinging through to service another hatch.

If Knight plus Ashe taught all that was necessary to know to develop a cargo boom to service two holds, no patents for rotary, fork, pendulum or other gears

17. Tr. 2020.

18. Tr. 2022.

19. Tr. 2057.

20. Tr. 2059.

21. DX 67, p. 9–4.

22. Sprengel, Tr. 273.

23. PX 123, p. 65.

24. Tr. 2262–63.

25. Tr. 2060.

26. Tr. 2085.

27. Tr. 2097.

28. Tr. 2094–97.

29. Tr. 2449.

30. Tr. 2088, 2449.

for the same purpose should ever have issued.[31]

d. Lehmann Patent 3,042,222 (PX 36).

This patent, issued on July 3, 1962, on application filed April 13, 1959, relates to the "gallows" boom previously mentioned. It is worthy of more than footnote emphasis that while the preferred structure is mounted on a turntable, Claims 1, 2 and 5 do not refer to a turntable. Compare this with the criticism of Figures 10 and 11 of the patent in suit.

The Court would be inclined summarily to dispose of citation of Lehmann '222 on the contention of obviousness, since at the trial and in argument and briefing it was treated by defendant as a two-legged "boom" mounted on a turntable. The upper cargo block "is *pivotally* mounted at the head of the boom to permit the cargo purchase to swing from one side of the boom when shifting from one hatch to another . . ."[32]

It has been shown that efforts to meet the problem of shifting a cargo boom to serve two hatches without rerigging had been attempted by rotating heads on the tops of booms; by rotating the boom on a pivoted base; and Lehmann '222 adds a turntable to rotate the boom and winches. But the arrangement of Lehmann '222 by which the boom and winches are rotated, pivotal mountings being provided to permit the cargo purchase to swing from one side of the boom to the other side in this process, is completely different from the patent in suit, where the boom does not rotate, but moves fore and aft, and the cargo purchase does not pivot or swing from one side of the boom to the other, but pendulates with the fore and aft swing of the boom, always remaining on the same side(s) of the boom.

The processes and concepts are completely different; and while Lehmann '222 may well have been anticipated or at least made obvious by the prior art, this is not true of Sprengel '390.

Defendant seems to be properly sensitive as to the practicality of Lehmann '222, which has never been pragmatically demonstrated.

The Court is fully aware of the rule that the issuance of a patent creates a "presumption" that the structure disclosed is operative. Simmons Company v. A. Brandwein & Co., 250 F.2d 440, 447 (7 Cir. 1957).

Even if Lehmann '222 were practical, the Court would still be clearly of the opinion that it did not make Sprengel '390 obvious. Despite its reliance on the presumption of operability from the mere issuance of a patent, defendant devotes approximately one-third of its total argument on obviousness to an effort to show that Lehmann '222 *is* operable.

First, it is argued that skepticism as to the attack on operability of the Lehmann '222 patent "should be particularly great" since the patentee was a naval architect "and is known to have actually designed the successful rotary two hatch cargo gear" of United States Patent No. 3,107,790 "which was actually placed on operating vessels of Prudential Lines . . ."[33]

However:

(1) The fact that an inventor has one practical invention does not necessarily mean that another patent of the same inventor is operable.

(2) The "successful two hatch rotary gear" is covered by a patent in which the filing date is after the filing date of '222, and its date of issuance is after that of '222. It might just as plausibly (or implausibly) be argued that Lehmann realized the impracticability of the device ultimately covered by '222, and went to a different rig in '790.

---

31. Including that issued to Sperg of Sun, processed by Grace's attorneys, who did not feel obligated to disclose this allegedly completely anticipating art to the Patent Office.

32. Defendant's Brief after trial, p. 33, emphasis added.

33. Defendant's Brief after trial, p. 35.

(3) The "successful rotary two hatch cargo gear" of '790 was installed on only two ships on a "two for the price of one" deal. A rather modest success.

(4) The Lehmann '222 gear has never been installed on any ship.

Second, the gallows rig was listed in a "Cargo Handling Study" prepared by George G. Sharp, Inc., for the Maritime Administration. Although Stiglich had been associated with the Sharp organization, he was not familiar with the calculations, if any, made by Sharp and made no attempt to familiarize himself with them before testifying; and had never discussed the usefulness or feasibility of the gallows-type design prior to his contact with this suit.[34]

Third, defendant discusses at length the testimony as to the practicality, or impracticality, of the Lehmann '222 rig. In this connection some language difficulties were apparent in Sprengel's testimony, in which he stated that he first faced the English word "impractical" in this Court.[35] The Court believes it fair to say that his final conclusion was that while an operative gallows-type gear could be constructed, the cost of construction and maintenance of Lehmann '222, as compared with the pendulum rigs, would make the Lehmann '222 impractical from a business or economic standpoint.

Admittedly, rotating platforms can be and have been used for the support of cargo blocks secured to a cross-piece at th upper end of the two parallel sides of a "boom", which do not swing over center.[36] There is no evidence that they have ever been, or could be, used for a 120 ton load.

Sprengel took the position that the boom of Lehmann '222 is deficient due to torque caused by the topping lifts[37] when the boom is trained out and the force in the shorter of the topping lifts has gone to zero. Despite Stiglich's denial that zero force does exist in the Lehmann gear,[38] Sprengel demonstrated its possibility on the electric model of the '390 gear.

Although Stiglich offered detailed computations relating to the gallows design, they did not include many elements, such as three-dimensional forces, torque, deflection, or calculation of the gooseneck design.[39]

The model of Lehmann '222 was built from a sketch prepared by Stiglich, who checked it, and had the wiring[40] changed.[41] As rigged, the gear could be used for light cargo only.[42] Moreover, because of the rotating platform, Lehmann '222 would require the use of separate winches for auxiliary, or lighter cargo, booms.[43]

Were it necessary to choose, the Court would hold that, while at great expense Lehmann '222 could be made workable, it would be definitely inferior to the Sprengel '390 pendulum; a conclusion which it shares with (or is shared by) the shipping industry.

(5) Patent as valid reference irrespective of actual use.

While admitting that the gallows rig of Lehmann '222 has never been used, defendant argues that this does not detract from the effectiveness of the teach-

34. Tr. 2327.

35. Tr. 2621.

36. PX 123, pp. 82–93.

37. The topping lifts control the motion of the boom in lowering, raising, and/or going from side to side.

38. Tr. 2235. Stiglich's testimony indicates that because in the United States (contra Germany) calculations are made only on the main outreach, he did not calculate the stresses that would occur if the gear were subjected, unintentionally or advertently, to operation beyond that contemplated in ordinary operations.

39. Tr. 525, 2382, 2409, 2509–19, 2590— Sprengel.

40. The way in which the wire rope is run through the blocks.

41. DX 69; Tr. 2130.

42. Tr. 2156.

43. Tr. 2454.

ing of that patent. The short answer is that the use of a rotary table, requiring the turning of the boom by 180° does not teach the use of pendulum gear, and a raising and lowering of the boom fore and aft on a gooseneck.

The cases cited by defendant do support the proposition that a paper patent is relevant on obviousness, but the primary thrust has been where the paper patent was an anticipation. National Filters, Inc. v. Research Products Corp., 384 F.2d 516, 518 (5 Cir. 1967); Morton v. Ladd, 218 F.Supp. 824 (D.C.D.C. 1963); B. F. Goodrich Co. v. United States Rubber Co., 147 F.Supp. 40, 63 (D.Md.1956) affirmed 244 F.2d 468 (4 Cir. 1957). The *Goodrich* case at page 63 and the therein cited cases of Western States Machine Co. v. S. S. Hepworth Co., 147 F.2d 345, 350 (2 Cir. 1945) and Zephyr American Corporation v. Bates Manufacturing Co., 128 F.2d 380, 385 (3 Cir. 1942), dealt only with the use of paper patents for the Section 102 defense of anticipation.

(6) Manner of conceiving the rig.

Defendant argues that "it is evident that the conception of the rig of the patent in suit was not in response to any serious and long unsolved problem",[44] on the ground that the problem of swing through without re-rigging had been "solved" by a number of earlier rigs such as the old fork, and rotary gear. It certainly had not been completely satisfactorily solved, as shown by the fact that the old fork, although highly successful commercially, was immediately superseded by the pendulum gear. The lack of complete satisfaction is shown by the Sperg patent by an employee of Sun, No. 3,286,851, issued November 22, 1966 on application filed November 6, 1964.

Defendant again adverts to the short period involved in the conception and birth of the pendulum rig. While the period of gestation may vary from two years in elephants to nine months in humans to days with fruit flies, this

Court has been cited to no authority, and is aware of none, that equates novelty and usefulness with length, or shortness of time. As Sprengel aptly put it, "You either have it, or you don't have it." He had it.

(7) Independent development of three separate rigs.

Defendant contends that "three separate pendulum swing through rigs were developed independent of plaintiff and Mr. Sprengel."[45] This appears to be inconsistent with defendant's immediately preceding contention, noted above, that Sprengel's conception was not in response to any serious and long unsolved problem. If this were a correct appraisal, at least four persons wasted a very substantial amount of time and money on a nonexistent problem.

The three rigs mentioned by defendant are:

(a) A double pendulum gear developed by the East German Warnowwerft yard.

This resembled the double pendulum rig in some respects but the method of fixing the span or topping tackle to the boom differed. The pendulum principle may well have been derived from Sprengel, since Warnowwerft's patent application was not filed until October 1964, while Sprengel's invention was conceived, and the first single pendulum block was sold by Blohm & Voss, in 1963.

Moreover, at the request of Warnowwerft, Sprengel discussed the double pendulum in 1967 or 1968. "They asked us if we could have some agreement."[46] Warnowwerft took a license (DX 25).

(b) Sperg patent No. 3,286,851.

Sperg, a Sun employee, in June of 1964, prepared a sketch of a double pendulum rig. This was abandoned, and the patent issued to Sperg does not have a pendulum fitting.[47] This would seem to the Court clearly to negative obviousness. Sperg's first sketch of double pendulum fitting, and his abandonment thereof, and the securing of a patent for a dif-

44. Defendant's Brief after trial, p. 49.

45. Defendant's Brief after trial, p. 53.

46. Tr. 1582–83.

47. Defendant's Brief after trial, p. 56.

ferent gear, show that he did not regard the pendulum device as the "obvious" solution to the swing-through problem. Sprengel did.

Moreover, Sun did not install the Sperg patented gear on the Santa Lucia class, or any other vessel constructed by it.

(c) Stiglich.

Defendant states:

"Mr. Stiglich is the third independent person to come up with the basic concept of the Sprengel invention. He conceived a heavy lift rig with sheaves mounted at the head of the boom which was in principle identical to the Sperg rig as shown in plaintiff's Exhibit 68 (R. 2241–6). Mr. Stiglich's independent conception was approximately the second quarter of 1964 (R. 2241–A)".[48]

What Stiglich in fact said was that in the latter part of 1963 in considering heavy lift gear for an American President Lines, ship, he had experienced difficulty with the Stulcken fork-type boom; the engineering manager for American President Lines was quite disturbed at the forks, which he felt "were ridiculous in some respects". Stiglich did a little study, and "came up with an idea of putting a pin through the head of the boom, and mounting sheaves on it and providing tackle on each side of the boom in the form of a split hoist." He showed the model he had made to Klewsaat of MacGregor in the second quarter of 1964, and showed him "a couple of sketches of the solution to the fork, who then showed drawings for a patent application for the single pendulum rig".[49]

Stiglich then testified that the "idea of the principle" in the Sperg patent was identical to one he had, "in that it had the cross pin through the head of the boom with multiple sheaves and the split cargo hoist" but he had not worked the idea out in as much detail as shown in the Sperg patent.[50]

The importance Stiglich attached to this "idea of the principle" is shown by the fact that he did not retain the sketch, or a copy of it; he thought he might have left it with Klewsaat.[51]

Klewsaat categorically denied ever receiving any such sketch from Stiglich.[52]

Notably, there is no claim by Stiglich that his sketch showed any pendulum gear.

By way of summary, despite shear legs and Ashe, no one (including the designers of rotary heads, rotary booms and rotary platforms) prior to Sprengel came up with pendulum gear for a boom handling 120 ton or heavier loads, capable of servicing two hatches without re-rigging.

Unobviousness is further demonstrated by the reaction of those skilled in the art when they learned of Sprengel's invention. Bebler thought the invention was "new and novel".[53]

Hamburg America Line, the purchaser of the first pendulum-block gear, was so skeptical that Sprengel was forced to agree that if the pendulum boom did not operate as represented, he would replace it with a fork-type gear. No replacement was made or demanded.[54]

If the pendulum were so obvious, Sperg's "invention" would have been even more so. Yet Sperg obtained a patent, in the prosecution of which defendant's counsel did not direct the attention of the Patent Office to shear legs and davits—now so heavily relied upon. (Defendant's counsel deny then knowledge of shear legs and davits now relied upon. Defendant's Reply Brief, p. 11).

■ The case is one in which all the data urged in support of obviousness were available to every one; but only Sprengel came up with a pendulum.

48. Defendant's Brief after trial, p. 57.

49. Tr. 2241A.

50. Tr. 2242.

51. Tr. 2243.

52. Tr. 2717–18; 2723–24.

53. PX 123, pages 53–4, 65.

54. Tr. 576–7.

Simple as that device may seem in the light of hindsight, it escaped all others. Simplicity, instead of an objection to invention, may constitute its great excellence and value. "It only remains now for the wisdom which comes after the fact to teach us that . . . [Sprengel] discovered nothing, invented nothing, accomplished nothing." Carnegie Steel Co. v. Cambria Ivan Co., 185 U.S. 403, 446, 22 S.Ct. 698, 715, 46 L.Ed. 968. See also Diamond International Corp v. Walterhoefer, 289 F.Supp. 550, 552–553, 563–554 (D.Md.1968) and cases cited.

■ The Court unhesitatingly holds that even apart from commercial success,[55] Sprengel's Patent '390 is valid under the requirements of United States Code, Title 35, Section 103.

## FAILURE OF CLAIMS TO RECITE AN OPERABLE STRUCTURE

■ This contention, that the claims of '390 fail to meet the specificity of United States Code, Title 35, Section 112, involves a logical inconsistency with the contention that the patent is invalid on the ground of obviousness. Certainly one "having ordinary skill in the art" would find it obvious not to develop [56] an inoperative structure. If the pendulum gear were obvious, it must be operative.

Further, the argument advanced that Lehmann '222 is presumed to be operative merely because the patent issued, even although it had never been used, would apply with even greater force to '390, on which not only has a patent issued, but substantial commercial success has been achieved.

With the authorities cited by defendant that a claim to be valid must recite a structure that is capable of performing its purported function there can be no quarrel. No purpose would be served by citing them, or supplementing them.

Apparently the charge of inoperativeness is limited to claims 14, 15 and 18 which are in terms directed to a double pendulum rig.[57] The charge is primarily directed to the failure of the claims to call for

(a) a single runner, and to define the structure for transferring the runner from one purchase block fitting to the other purchase block fitting by an equalizing sheave arrangement.

To this there are several replies.

(i) Perhaps ad hominem, as drafted and filed by Sun's counsel, Claim 1 of Sperg's application did not claim an endless rope or cross-over sheave; and as allowed does not refer to a cross-over sheave.

(ii) The double pendulum can be operated without an endless rope and crossover sheave, although it is doubtful if this would be satisfactory in ordinary use.[58]

(iii) Knight clearly shows an equalizing sheave. Old and well-known elements need not be included in claims. Rohm & Haas Co. v. Roberts Chemicals, 245 F.2d 693, 697 (4 Cir. 1957).

(iv) This element is adequately disclosed in the specifications and drawings.

Failure to recite:

(b) A structure permitting the upper purchase cargo blocks to move transversely. Admittedly, although the patent discloses a pin fitting permitting this movement,[59] the claims contain no specific reference thereto.

In addition to Rohm & Haas, *supra*, see Proctor & Gamble Manufacturing Co. v. Refining, Inc., 135 F.2d 900, 906 (4 Cir. 1943).

Claims 1–3 are broad enough to cover the double pendulum, in that the fittings are mirror images, and that equalizing means are old and well-known in the art.

---

55. PX 52 and 52A; Tr. 681–688.

56. The term "develop" is used rather than "invent", because if the structure were inoperative, it would not be "novel" or "useful".

57. Defendant's Brief after Trial, p. 61; except insofar as plaintiff contends that

58. Tr. 1523–27.

59. Defendant's Brief after trial, p. 65.

This particular element is not part of the invention and should not (and probably could not properly) have been incorporated in the claims.

## SPRENGEL AS PATENTEE AND EMPLOYEE

Defendant contends that the weight of Sprengel's testimony is greatly lessened by the fact that he is not only the patentee of '390, but also is an employee of plaintiff.

The Court observed Sprengel over extended periods of time as a witness. He impressed the Court as one of the most forthright and honest witnesses the Court has seen as a judge or in private practice.

Of the rather nit-picking items cited by Defendant, only one justifies a specific examination. This is the assertion that Sprengel was less than candid in stating the inventors of the old fork patent. In fact, he offered a completely satisfactory explanation of how the patent as issued happened to include the names of three inventors. (Tr. 1437-9).

Application was made in Germany for a patent on a rotary rig, of which patent Kohnenkampf, Sprengel and Tietgen were co-inventors. Later an addendum was filed, apparently properly under German law, to add the old fork, the invention of Sprengel only. The combined application was filed in the United States. Later the rotary part was withdrawn, leaving only the fork. By oversight, the names of Kohnenkampf and Tietgen were not stricken.

Application was filed in the Patent Office for a certificate under 35 U.S.C. § 256 and Rule 324 deleting the names Johann Dietrich Kohnenkampf and Hans Peter Tietgen as joint inventors in Patent No. 2,914,193. Counsel for plaintiff have been advised by the Patent Office that the certificate of correction has been approved and will be issued in due course. The change in priority date from February 11, 1954 to April 5, 1954, is clearly non-prejudicial to defendant. It is unnecessary to consider whether the change could have been made in this Court, under Iowa State University Research Foundation v. Sperry Rand Corp., 444 F.2d 406 (4 Cir. 1971).

The Court finds as fact and concludes as a matter of law that Patent No. 3,-236,390, and Claims 1–3, 14, 15 and 18 are valid.

## ALLEGED MISUSE OF PATENT

█ Having found Patent '390 to be valid, normally the Court would proceed to the question of infringement. However, defendant with more than ordinary vigor and earnestness, urges that the patent is unenforceable because of misuse—conduct with regard to the patent that is beyond the scope of the patent monopoly. If this be true, the patent is unenforceable, however egregious the infringement, until the misuse is purged.

█ Defendant has standing to raise the misuse defense, even though it is not a licensee. Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 493–494, 62 S.Ct. 402, 86 L.Ed. 363 (1942); Rocform Corp. v. Acitelli-Standard Concrete Wall, Inc., 367 F.2d 678 (6 Cir. 1966); Berlenbach v. Anderson and Thompson Ski Co., 329 F.2d 782 (9 Cir. 1964); Baldwin-Lima Hamilton Corp. v. Tatnall Measuring Systems Co., 169 F.Supp. 1 (E.D.Pa.1958), aff'd per curiam, 268 F.2d 395 (3 Cir. 1959).

The alleged misuses are claimed to be:

1. International patent agreements, violating the anti-trust laws, resulting in an unlawful division and allocation of markets, restraining the foreign commerce of the United States.

2. Requiring MacGregor to pay royalties on unpatented masts.

3. Tying unpatented material and services to the patent.

4. Precluding the licensee from challenging the validity of plaintiff's patents.

Of course, the burden of proof is on the defendant, the proponent of the issue. White Motor Co. v. United States, 372 U.S. 253, 259, 83 S.Ct. 696, 699, 700, 9 L.Ed.2d 738 (1963). United States v.

Grinnell Corp., 236 F.Supp. 244, 248 (D.R.I.1964); aff'd, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); Sperry Products, Inc. v. Aluminum Company of America, 171 F.Supp. 901, 936–938 (N.D.Ohio 1959), mod. and aff'd, 285 F.2d 911 (6 Cir. 1960), cert. den. 368 U.S. 890, 82 S.Ct. 139, 7 L.Ed.2d 87 (1961).

1. Plaintiff's International Agreements in Violation of the Antitrust Laws Result in an Unlawful Division and Allocation of Markets, Restrain the Foreign Commerce of the United States and Illegally Insure Plaintiff's Monopoly Position.

In support of these propositions, defendant asserts:

(a) Plaintiff dominates the market.

Confining itself to two-hatch rigs, defendant points out that of the 272 installations of two hatch gear (excluding defendant's gear in issue) 221 have been plaintiff's, or 81%. Of the remaining 51 rigs, 23 are Newport News (Sparrow) rigs, 2 are Lehmann rotary rigs, 20-25 are German gears, and one a Japanese rig. The Lehmann gallows rig has not been installed anywhere.

Of the 79 two-hatch rigs installed in the United States, plaintiff accounts for 54, or 68%, with Newport News (Sparrow) accounting for 23 of the remaining 25.[60]

Several comments are in order:

(i) Two-hatch gear is not the relevant market. United States v. Charles Pfizer & Co., 246 F.Supp. 464, 468–470 (E.D. N.Y.1965); United States v. Charles Pfizer & Co., 245 F.Supp. 737, 739 (E.D. N.Y.1965); United States v. E. I. Du Pont De Nemours & Co., 351 U.S. 377, 393, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); United States v. Grinnell Corp., 236 F.

Supp. 244, 250 (D.R.I.1964); Diamond International Corp. v. Walterhoefer, 289 F.Supp. 550, 576–577 (D.Md.1968).

In fact, the revelant market is heavy lift cargo gear for ships. This includes conventional gear, as well as the rotary head, rotary mast, turntable, bipod, fork and pendulum gears. The owner who contemplates building a ship has an extensive choice. Probably cost and serviceability are the determining factors.

(ii) Sprengel (Stulcken, Blohm & Voss) have been in the forefront of the development of heavy lift gear. It is a reasonable inference that their gear has been selected for its performance. In fact, a pendulum gear was installed on the Transcolorado to serve a single hatch.

(iii) The Buy American requirements as to American subsidized ships (46 U.S. C. section 1155) certainly make the various gears, such as the German Stulcken, truly competitive.

(iv) Conventional and more advanced and specialized gear are alternatives in designing a ship. The differences between their characteristics are less than between cellophane, foil, wax paper, glassine and polyethylene; or between citric, tartaric, fumaric, lactic and phosphoric acids, lemon juice and vinegar; or paper board and molded pulp egg cartons.

Even assuming that two-hatch gear is the relevant market, plaintiff's 68%[61] share of the domestic market is not surprising or improper; plaintiff literally created the market, providing (especially in the fork and pendulum devices) superior gears. Plaintiff lawfully[62] acquired United States patents on the only gear (fork and pendulum types) its licenses ever sold. Both its design and manufacturing quality are superior.[63]

---

60. PX 81.

61. The 68% does not take into consideration the 12 gear sets on defendant's ships, and another on the S/S Admiral Callahan (PX 173) built by Sun, and which it contends do not infringe. If they do not, they are clearly competitive.

62. See previous discussion of the correction of the erroneous listing of inventors. This cross-cuts defendant's several references in the Misuse section of its brief to the "invalid" fork patent.

63. Bebler, PX 123, p. 47.

Shipowners have specified such gear; e. g. Hansa, Hudson Waterways. The defendant itself specified plaintiff's gear (then the fork-type.).

Somewhat remarkably, defendant in its 26 page reply brief on validity and misuse, devotes two and one-half pages, but not under the topic of misuse, to the argument that commercial success is not such as to support patentability. While admitting that no sales of the old fork-type have been made since the introduction of the pendulum rig, defendant asserts that the single pendulum is already obsolete, and that no sales have been made of the rigs covered by the '390 patent since May 1967. This is ascribed primarily to the present trend toward containerships; and "orders for other types of gear not covered by the patent . . ." (Defendant's Reply Brief, p. 14).

It would be hard to make a stronger argument that the gear of the patent in suit does not have monopolistic control, or the possibilities thereof. Defendant's argument in this respect also seems inconsistent with the contention that two-hatch gear is the "relevant market".

Defendant cites the "web" of agreements covering the major ship building countries of the world, including agreements with:

MacGregor—Comarian, Inc. (DX 17 and DX 19)

Nissho Company, Ltd. and Lateno Seisakusho and Company Limited of Japan (DX 23)

Warnowwerft Warnemunde of East Germany (DX 25)

Constantine and Co. Ltd. of England (DX 27)

Delta of Yugoslavia (DX 28) and

International MacGregor (IMGO) (DX 29 and DX 30—expired in 1969).

Defendant contends that these agreements unlawfully divide and allocate the world-wide market for two-hatch cargo gear, by the insulation of each licensee in its own territory from competition with each other licensee with respect to any mast structure covered in any country by a patent held by plaintiff or one of its licensees. This allegedly eliminates price competition, sustains plaintiff's royalty structure, and restrains the foreign commerce of the United States.

So broadly stated, defendant would seem to attack the validity of more than one territorially restricted exclusive license. Obviously, if plaintiff were large enough, it could operate worldwide independently.

Defendant seeks generally to group these together, as if their contexts, contents and scope were similar. They will be considered in the order listed.

As defendant places principal emphasis on the MacGregor agreement, the only one with a United States corporation, it is interesting to note the origin of this relationship.

The plaintiff builds ships in its yard at Hamburg, and manufactures and installs equipment for such ships, including heavy lift cargo gear of several kinds. It has entered into agreements with various non-German companies for the manufacture, and/or representation as its agents for the sale, of heavy lift cargo gear of its design.

MacGregor is a small company having 25 employees which supplies equipment to the maritime industry. Its primary business is in hatch covers, but it also supplies cargo gear of the conventional type, the bipod type and the fork and pendulum-block types of two-hatch gear of plaintiff's design. MacGregor has no manufacturing facilities of its own. It sub-contracts the manufacture of specially fabricated items and buys standardized parts from others (Klewsaat, Tr. 1613, 1642, 1694; Sprengel, Tr. 841).

Plaintiff's first contact with the United States market for cargo gear was in supplying in 1959 the fork-type gear for the Del Rio class of ships built in the Avondale yard for the Delta Line (Sprengel, Tr. 1443). MacGregor acted as a sales agent (Sprengel, Tr. 1444). Plaintiff then learned of the "Buy American" Act whereby not only must a ship built under subsidy from the Maritime

Administration be constructed in a shipyard of the United States, but the equipment installed on it must be produced or manufactured here (46 U.S.C. Section 1155). In fact, the gear supplied to the Delta Line was permitted under a special waiver, and with the knowledge that such practice could not be continued (Sprengel, Tr. 1442–3; 1446; Klewsaat, Tr. 1621–23, 1627; Bebler, PX 123, p. 147).

Later, when the Challenger class was to be built for the United States Lines, MacGregor requested a manufacturing license from plaintiff in order to be able to offer gear of plaintiff's design to shipyards in the United States in view of the Buy American Act (Zeitlin, DX 81, p. 72).

The arrangement between plaintiff and MacGregor started out informally, but was formalized in a 1962 agreement (DX 14, 16; Sprengel, Tr. 1431–2). After plaintiff acquired Stulcken and in view of the expiration by its terms of the 1962 agreement, the current agreement (DX 17, 19) was executed in 1967. Defendant examined Zeitlin and Klewsaat at great length during their depositions regarding the negotiations underlying the 1962 and 1967 agreements, respectively, but did not adduce any testimony of plaintiff conditioning a license on MacGregor's paying money on, or being required to purchase, unpatented goods or services (Zeitlin, DX 81, e. g., pp. 52, 56, 77, 92–93, 117–20, 113–4, 146–9).

(1) The MacGregor agreement (DX 17) grants MacGregor the exclusive right to manufacture and sell, and with plaintiff's prior written approval to cause to be manufactured and sold, cargo handling gear covered by patents owned by plaintiff and listed in Exhibit A to the agreement. It also grants the right to use any improvements, modifications and new inventions controlled by plaintiff; to make, use or sell in its Territory any patented or unpatented inventions, processes or devices owned or controlled by plaintiff; and to acquire from plaintiff all parts and ancillary equipment required by MacGregor.

MacGregor's "Territory" is defined as the United States of America and its territories and possessions, and Canada and Mexico. This is the area as to which Klewsaat testified that MacGregor could compete effectively. (Tr. 1692).

Defendant contends that these grants illegally preclude MacGregor from exporting structures of patents not patented in the United States to another country in which they are not patented. Elliott Co. v. Lagonda Manufacturing Co., 205 F. 152, 157 (W.D.Pa.1913), aff'd 214 F. 578, 580 (3 Cir. 1914). There the courts held that language in a settlement agreement between competitors operating in foreign countries that one of the parties licensed "to make, use, and sell to others for use throughout the United States" limited its activities to the United States.

■ The grant of an exclusive license to make and sell a device under patents, trademarks and know-how within a defined area does not of itself constitute a prohibition from selling on a non-exclusive basis outside that area. United States v. L. D. Caulk Company, 126 F.Supp. 693, 707 (D.Del.1954). Where such prohibition is intended, it can be expressly stated, as in Brownell v. Ketcham Wire & Manufacturing Co., 211 F.2d 121, 124 (9 Cir. 1954);[64] or implicitly as in the Lagonda cases, *supra.*

In the MacGregor license, the exclusive rights granted MacGregor in the Territory meant that plaintiff could not, so long as the MacGregor agreement was in effect, grant anyone else the right, or itself exercise the right, to manufacture and sell within that Territory. United States v. L. D. Caulk Company, 126 F. Supp. 693, 706–707 (D.Del.1954).

The license also includes "the exclusive right for sale of Stulcken Masts manufactured and installed outside the Territory to" owners of vessels, and naval architects and consultants having

---

64. Also holding exclusive licenses to be valid. 211 F.2d at 129.

their principal place of business in the Territory. (DX 19, p. 4).

Section 12 provides for a "Commission", as distinguished from "Royalty", dependent upon whether plaintiff manufactures the masts, or only supplies designs for masts, for installation outside of the Territory.

MacGregor has been involved as sales agent with respect to the sale of gear of plaintiff's design to Brazilian and Chilean shipowners. (Tr. 1640–41; DX 81, pp. 210–14; 255–56).

(2) Nissho—Tateno (DX 23).

Defendant correctly characterizes it as a "complex agreement."[65]

It also, much more questionably, describes it as an agreement which restrains trade between Japan and most countries including the United States and unlawfully divides markets affecting the foreign commerce of the United States.

The agreement recites the ownership by plaintiff of certain listed patents and that it has information and data ("know-how") including drawings, plans and specifications for the design, manufacture and installation of the Stulcken mast; that plaintiff is willing to grant, and "Nissho wishes to agree to a sales agreement and Tateno wishes to manufacture certain parts of the mast. . .".

Plaintiff appointed Nissho as its agent for the masts covered by the Addendum and the know-how gained by plaintiff, and Nissho agreed during the term of the agreement not to produce, sell or represent any other type of cargo gear. Nissho was given Japan on an exclusive basis, and "Cambodge [sic], China, Indonesia, Laos, Malaysia, North and South Vietnam, Phillippines, Republic of Korea, Thailand, Union of Berma, and Formosa" on a non-exclusive basis; i. e., Blohm has the right to sell masts or parts thereof direct and/or appoint any other

sales representative and/or licensees in these territories.

Nissho was authorized to sell to Japanese shipbuilders and shipowners and to non-Japanese shipowners "in case they build and/or convert ships" by shipbuilders in Japan.

Nissho is not allowed to sell, export or re-export the masts or parts thereof except in Asian countries above recited, and undertakes to impose on "his" customers a condition not to export the masts or parts thereof and shall be liable to Blohm "that none of the customers as indicated . . . above exports the mast previously purchased by Nissho from Blohm respectively Tateno." [sic]

Blohm "authorized Tateno as the exclusive manufacturer of fittings and accessories of the mast in the territory." To the extent that Blohm does not supply fittings and accessories to Nissho, they are to be purchased by Nissho exclusively from Tateno.

Included in the Addendum were all the masts disclosed in all of paintiff's patents, although no Japanese patents were then held by plaintiff.

Nissho and Tateno asked for licenses to manufacture and sell because of Japan's currency restrictions and the expense of shipping heavy gear overseas into Japan. (Tr. 843–8, 1309, 1493–4)

There is no evidence that Nissho—Tateno were or are involved in the United States in any way, or that any domestic manufacturer was supplying, or attempting to supply, heavy lift gear to the Japanese market.

(3) VEB Warnowwerft, Warnemunde, German Democratic Republic (DX 25).

Defendant devotes six lines of its Brief (pp. 79–80) to this license, asserting that it forbids competition with plaintiff, since it restricts Warnemunde to installations in East Germany by virtue of the limiting grant of paragraph 1 to "new

---

65. Defendant's Brief after trial, p. 77.
 The language is unique, and leaves much to be desired. Sprengel does not understand Japanese; the Japanese did not understand German, and so the agreement was prepared (by an understand-. ably anonymous scrivener) in English.

construction and for rebuilding in or for the GDR (German Democratic Republic)".

The language quoted by defendant is from Item 1, headed "Subject of the Contract".

Item 2 is headed "Contractual Territory". Paragraph 1 reads as follows: "The licensee is given the right to use the license_products according to item 1 in those countries in which the licenser has applied—for and granted protected rights. This use comprising the use and marketing of the subjects of the license. The use of the license products by the licensee in all countries in which the licenser owns no protected rights is unaffected hereby."

VEB had a contract with a French owner who had specified Stulcken masts or equal. Plaintiff had a French patent, and VEB, despite its own patent, asked for a license agreement. A naked license was granted, without technical assistance or know-how; and VEB was not permitted to use the Stulcken name. (Tr. 1516–19).

(4) Constantine & Co., Ltd. (DX 27).

Although listed as part of the "web", this agreement receives not even one line of discussion in defendant's Brief.

Under the agreement, Constantine is appointed sole agent for the Stulcken Mast in the United Kingdom, on a straight commission basis. Different rates of commission are payable on deliveries and license and drawing fees.

The license does not in terms forbid competition.

(5) DELTA Inostrana Zastupstva, Serivisi, Kosignacije, Rijeka, Yugoslavia (DX 28).

Delta is given an exclusive sales agency for Yugoslavia on a straight commission basis, and (not unreasonably) "is obligated to refrain from any competition with B & V . . . ."

(6) International MacGregor Organization (DX 29, 30).

Starting as a world-wide exclusive license to manufacture and sell heavy load handling gear on January 22, 1957, it was reduced to "France and the U.S.A." on January 14, 1960, and terminated as of January 22, 1969.

Defendant's only discussion in its Brief (p. 80) is:

"Similarly the IMGO agreement by implication restricts IMGO's territory to France with IMGO agreeing (Section 5) not to 'benefit by the fact that the Stulcken mast is not protected by patent rights in France.'"

A specific restriction to "France and the U.S.A." does not seem to import, or support, a restriction to France.

The significance, or even the meaning, of the statement that IMGO is not to "benefit" from absence of patent protection in France is unexplained.

(b) Division of Markets and Elimination of Competition—Sherman Act, Section 1.

In support of the proposition that an agreement to divide markets is a violation of Section 1 of the Sherman Act, defendant cites United States v. National Lead Co., 63 F.Supp. 513 (S.D.N.Y.1945), aff'd 332 U.S. 319, 67 S.Ct. 1634, 91 L.Ed.2d 2077 (1947); United States v. Sealy, Inc., 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967); and Timken Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951).

These cases, however, are clearly and controllingly different from the case at bar. In each, the territorial division was the result of an agreement between competitors for a division of markets in the United States. In National Lead, there was a division agreement between three defendants and 19 co-conspirators with respect to titanium oxide and pigments thereof. Of the defendants, Dupont produced 76.5% of composite pigments and National Lead 23.5%. Of pure titanium oxide produced in the United States, Dupont accounted for 46.4% and National Lead 41.5%. The agreements involved the splitting of the whole world, and price fixing.

Significantly, even in this situation, reciprocal grant of patent rights, for a reasonable royalty, were approved (332 U.S. at 359–360, 67 S.Ct. 1634).

In Sealy, the licensor, substantially owned and controlled by "licensees", was in fact a joint venture of the licensees. The arrangements for exclusive territories were chargeable to the licensees and were part of an aggregation of trade restraints, including horizontal price fixing and policing of retail policies.

The Court pointed out that the situation was not like "territorial limitations imposed by a manufacturer upon independent dealers as an incident to the sale of a trademarked product." (388 U.S. at 354, 87 S.Ct. at 1851).

The ramifications of Timken have fortunately been capsulized in Sealy as follows:

> "Timken involved agreements between United States, British and French companies for territorial division among themselves of the world market for antifriction bearings. The agreements included fixing prices on the products sold in the territory of the others; restricting imports to and exports of the United States, and excluding outside competition . . ." (388 U.S. at 354, 87 S.Ct. at 1851).

Here, of the six alleged "web" like agreements, only VEB could even arguably be said to restrict manufacture among competitors; and if so construed, there is no showing how it could have affected foreign commerce to or from the United States.

The restrictions in the various agreements seem only to be the exercise by a patentee of his right either to decline to practice its invention; to practice it exclusively itself; to grant a single license or exclusive licenses with or without cross-licensing (Sperry Products, Inc. v. Aluminum Co. of America, 171 F.Supp. 901 (N.D.Ohio, 1959) aff'd and mod. 285 F.2d 911, 925–926 (6 Cir. 1960); [66]

cert. den. 368 U.S. 890, 82 S.Ct. 139, 7 L.Ed.2d 87 (1961), or to grant non-exclusive licenses.

The factual situation is equally destructive of defendant's argument.

Heavy gear of the type in question cannot, except in exceptional circumstances, be manufactured except at or adjacent to the shipyard in which is being built the ship in which it is to be installed. With American labor costs, and cargo rates (Tr. 845) such gear, patented or unpatented, could not competitively be manufactured in the United States for installation in Europe or Japan.

Neither Newport News nor the Lehmann rotary gear has ever been exported (Tr. 1692).

The Buy American Act is applicable to substantially the entire United States market for heavy gear. It alone would serve to exclude heavy gear manufactured outside the United States, regardless of the provisions of license agreements.

(c) Monopolization and Attempt to Monopolize—Sherman Act, Section 2.

On monopolization, defendant reiterates its figures as to the percent of the market (on two-hatch gears) attained by plaintiff previously made under (a) above. No further discussion seems required or justified.

Based upon its unproved contention of monopoly, defendant contends that from this an intent to monopolize may be inferred. Apparently abandoning this approach, defendant concludes this "point" with the conclusory allegation that plaintiff "has employed its patents through a world-wide web of agreements, the net effect of which has been an illegal restraint of trade and monopolization under Sections 1 and 2 of the Sherman Act and a misuse of the patent in suit." [67] Section (c) ends on the words with which it began.

In-between, defendant cites and relies upon United States v. Du Pont, *supra;* United States v. Grinnell Corp., 236 F.

---

66. Cited five times by plaintiff in its Brief after trial, with no rebuttal by defendant.

67. Defendant's Brief after trial, p. 87.

Supp. 244 (D.R.I.1964), aff'd 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); International Boxing Club v. United States, 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 242 (1959); and American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). In each of these, as in Du Pont, there had been concerted action by companies previously in active and open competition. They are not, and: " . . . are not comparable to cases where the parties, for example, merely have made a new discovery or an original entry into a new field and unexpectedly or unavoidably have found themselves enjoying a monopoly coupled with power and intent to maintain it . . . " (328 U.S. at 786, 66 S.Ct. at 1128).

(d) Patent Pool.

Defendant contends that the cross-licensing provisions in the MacGregor and Nissho-Tateno agreements are illegal "grant-back" provisions, citing United States v. National Lead Co., 63 F.Supp. 513 (S.D.N.Y.1945); aff'd 332 U.S. 319, 67 S.Ct. 1634, 91 L.Ed. 2077 (1956) and United States v. Associated Patents, Inc., 134 F.Supp. 75 (E.D.Mich. 1955); aff'd per curiam, 350 U.S. 960, 76 S.Ct. 432, 100 L.Ed. 834 (1956). Neither is helpful to defendant, and National Lead is harmful.

In National Lead, the Supreme Court upheld, against attack by the Government, provisions of the decree permitting National Lead and Du Pont to grant licenses "conditioned upon the reciprocal grant of a license by the applicant at a reasonable royalty . . . " (332 U.S. at 359, 67 S.Ct. at 1653) then "issued or pending, or issued within five years from" the date of the decree. (332 U.S. at 360, 67 S.Ct. at 1653).

In Associated Patents, the formerly competitive defendants had organized a patent holding and licensing company, in which were pooled existing and future patent rights, and each defendant had al-located to itself the exclusive right to manufacture and sell certain specified tools.

On the other hand, cross-licensing or even more, has been approved.

In Transparent-Wrap Machine Corp. v. Stokes and Smith Co., 329 U.S. 637, 645, 67 S.Ct. 610, 91 L.Ed. 563 (1947), the Supreme Court held that an agreement licensing [68] machine patents then owned or later acquired by the licensor, could properly contain a provision not merely requiring the licensee to cross-license the licensor, but requiring the licensee to *assign* to the licensor any improvement patents developed by the licensee.

In Sperry Products, Inc. v. Aluminum Co. of America, 171 F.Supp. 901 (N.D. Ohio 1959), aff'd and mod. 285 F.2d 911 (6 Cir. 1960), cert. den. 368 U.S. 890, 82 S.Ct. 139, 7 L.Ed.2d 87 (1961), the Sixth Circuit found no misuse of the patents in suit as a result of a provision for licensing and cross-licensing of foreign patents (285 F.2d at 925–926).

In Binks Manufacturing Co. v. Ransburg Electro-Coating Corp., 281 F.2d 252, 259 (7 Cir. 1960), cert. den. 364 U.S. 926, 81 S.Ct. 353, 5 L.Ed.2d 265 (1961) the Court found no illegality in a license requiring the licensee to assign to the licensor a royalty-free, non-exclusive license with right to sub-license, patents developed by the licensee.

It, therefore, is unnecessary to consider, although it should be noted, that the parties construe the MacGregor agreement to obligate MacGregor to grant only a royalty-free, non-exclusive grant-back to the plaintiff for use only in its own yard, and limited to the subject matter licensed to MacGregor.[69] Should MacGregor develop an improvement, negotiations would be necessary before plaintiff could extend rights thereunder to any of plaintiff's other licensees (Tr. 1647). Neither MacGregor nor any other

---

68. Coincidentally, the territory licensed was the United States, Canada and Mexico—the same as that licensed to MacGregor.

69. Sprengel, Tr. 1461–63, 1477–78; Klewsaat, Tr. 1646–47.

licensee of plaintiff has made any such improvement.[70]

Various additional provisions of the MacGregor Agreement—re Misuse.

(a) Defendant contends that paragraph 11 of the MacGregor Agreement (DX 19) requires the payment of a "royalty" on all Stulcken masts manufactured and installed in the "Territory". Zenith Radio Corporation v. Hazeltine, 395 U.S. 100, 135–139, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969) is relied upon as establishing the illegality of this provision. In that case, however, the Supreme Court made it abundantly clear that what it was condemning was *conditioning* the grant of a patent license upon payment of royalties on products which do not use the teaching of the patent . . ." (p. 135, 89 S.Ct. p. 1582; emphasis supplied).

This qualification — conditioning — is repeatedly stated.

For example, in approving the injunction granted by the trial court, the Court said:

" . . . The injunction reaches only situations where the patentee directly or indirectly 'conditions' his license upon the payment of royalties on unpatented products—that is, where the patentee refuses to license on any other basis and leaves the licensee with the choice between a license so providing and no license at all . . ." (p. 135, 89 S.Ct. 1583).

The word "condition" is used again in pages 136 and 137; and "conditioning" on page 138.

The Second Circuit has taken the above language as controlling. In Glen Manufacturing Inc. v. Perfect Fit Industries, Inc., 420 F.2d 319 (2 Cir. 1970); cert. den. 397 U.S. 1042, 90 S.Ct. 1365, 25 L.Ed. 2d 653 (1970), plaintiff had sued defendant under a licensing agreement under which defendant agreed to pay plaintiff a royalty of ten cents on each toilet tank cover made or sold by it. Defendant contended that this applied only to toilet tank covers within the scope of the patent. Plaintiff contended that the agreement contemplated royalties on all toilet tank covers manufactured or sold by defendant, whether or not they were included within the scope of the patent. The trial judge agreed with plaintiff's construction, but held it fatal to enforceability as amounting to patent misuse.

A few days after the trial court's decision, the Supreme Court handed down its decision in *Zenith, supra.* The Second Circuit remanded the case "for further findings on the issue of 'conditioning' and an explicit determination of whether the license agreement amounted to patent misuse under *Zenith*." (420 F.2d at 321).

There is no evidence, or proffer of evidence, in this case that the MacGregor or any other agreement was "conditioned" upon the payment of "royalty" upon unpatented material. Nor is there any evidence that MacGregor, defendant, Sun or any one else asked for and was denied a license under '390 alone.

It is also at least arguable that the MacGregor arrangement is valid under Automatic Radio Manufacturing Co. v. Hazeltine, 339 U.S. 827, 833–834, 70 S.Ct. 894, 94 L.Ed. 1312 (1950). There the Court held that a provision that in return for a license by Hazeltine to use any patent (of which there were 570, with 200 applications) or future development in consideration of a royalty on all radio receivers manufactured by the licensee, regardless of whether or not any of Hazeltine's patents were used, was valid. The Court felt that "sound business judgment" might lead to this method as the "most convenient method of fixing the business value of the privileges granted by the licensing agreement." The licensee was not required to use any of the patents, but was free to use any and all.

Here the so-called "royalty" payable by MacGregor was a combined fee for the license of United States patents and foreign patents; a world-wide indemnity against infringement liability; a trade-

---

70. Sprengel, Tr. 1464, 1477–78; Klewsatt, Tr. 1646.

mark license; and the furnishing to it of substantial know-how and technical assistance.

From a practical aspect, MacGregor had never, under the 1962 or the 1967 agreement (DX 17 and 19) been requested to build or built any licensed gear which is not patented in the United States; and has never paid any "royalty" or fee to plaintiff in respect of the rotary (Type A) gear. (Tr. 1653).

3. Tie-In of Materials and Services.

Defendant contends that Paragraph 4E of the MacGregor license (DX 17) improperly "ties unpatented products, drawings and services to the patent in suit." [71] Paragraph 4E reads as follows:

"Licensee shall not be entitled to use any components or ancillary equipment of a Stuelcken Mast, whether patented or unpatented otherwise than in connection with a Stuelcken Mast. Licensee shall, however, be entitled to use non-patented components or ancillary equipment for a Stuelcken Mast for similar type of cargo gear, always provided, however, that Licensee shall be obligated to obtain the necessary drawings from Licensor for those not patented components or ancillary equipment against payment for the drawings provided by Licensor."

Defendant freely admits [72] that Paragraph 4E is ambiguous. It further argues that Paragraph 6A requiring MacGregor to comply with plaintiff's instructions, practices, and procedures as to design, manufacture and installation of Stulcken Masts, subject to deviation with consent, requires MacGregor to accept engineering and other services from plaintiff. Defendant seeks to analogize these provisions to Morton Salt Co. v. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942); Columbus Automotive Corp. v. Oldberg Manufacturing Co., 387 F.2d 43 (10 Cir. 1968); and National Foam System v. Urguhart, 202 F.2d 659 (3 Cir. 1953); and further refers to instances in which MacGregor has ob-

tained engineering services and drawings from plaintiff.

Admittedly, while MacGregor has acquired knowledge from which it could (probably) satisfactorily do the necessary engineering work and designing for ordinary modifications on Stulcken Masts, there are two clearly established aspects. First, plaintiff has an understandable pride in, and concern for, the preservation of its reputation for the finest in cargo masts. Secondly, MacGregor sometimes buys drawings from plaintiff because it does a good job on a competitive price, saving MacGregor the effort of reassigning personnel on its limited staff.[73] Plaintiff's charges for its drawings are negotiated upon the basis of what is required, the estimated engineer and draftsmen hours required, and the hourly charge rates for the type of work used by plaintiff in making drawings for its own use (Sprengel, Tr. 835, 838-9, 1339-45; 1351-52; Klewsaat, Tr. 1634-36; 1761-65).

MacGregor is not obligated to buy parts from plaintiff, nor could it do so (ordinarily) on subsidized ships under the Buy American policy. It normally sub-contracts the manufacture of especially fabricated equipment; and buys off-the-shelf component parts from others in the United States (Klewsaat, Tr. 1636, 1642-45, 1702; Sprengel, Tr. 1467-68).

MacGregor is not, in practice, nor by the express terms of the agreement, as construed by the parties, obligated to buy drawings or anything else (Klewsaat, Tr. 1635-36). Section 4C expressly limits payment for drawings to those supplied at MacGregor's request.

Again, there is no evidence of the conditioning of the grant of a license under the patent in suit upon the purchase of drawings or parts from plaintiff.

4. Barring the Raising of the Validity of the Patent in Suit is a Misuse.

---

71. Defendant's Brief after trial, p. 92.

72. Defendant's Brief after trial, p. 93.

73. MacGregor does not pay for drawings furnished for purposes of bidding on new jobs unless the bid is accepted.

Finally, defendant contends that the provisions in the MacGregor and Nissho-Tateno agreements that the licensees may not contest the validity of the patent in suit is, under Lear v. Adkins, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969) "a misuse".[74]

In defendant's Brief after Trial, thirteen lines were devoted to this contention; and plaintiff's Reply Brief devoted seven lines to it.

In this Court's opinion, these treatments were consonant with its relative (un)importance. Lear certainly held that a licensee was not, by virtue of a license, estopped to raise the question of invalidity of the patent when sued for infringement. *A fortiori*, clauses specifically negating this right are invalid. Lear expressly overruled Automatic Radio Manufacturing Co. v. Hazeltine Research, Inc., 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312 (1950). While this Court has some difficulty in following the Lear Court's reference to Hazeltine as "being itself the product of a clouded history",[75] it is of course bound by the holding.

To this Court it seemed elementary that the decision in Lear struck down the enforceability of the noncontestability provisions in the MacGregor and Nissho-Tateno agreements, as of and from, June 16, 1969, the date of the Lear decision. It did not seem possible to this Court that the striking down of a previously validated provision could invalidate such a contract in toto, particularly in view of the separability claims in each such agreement.[76] Moreover, it did not seem to this Court that any action was necessary on the part of the contracting parties. What could be served by them formally stating: "We

agree"; or "We accept and agree to be bound by the supreme law of the land."?

However, in argument, it appeared that defendant's position was not clear. This Court therefore addressed a letter to counsel for plaintiff and defendant, requesting a clarification of positions.[77] From the response it clearly appeared that defendant took the position that the noncontestability clauses rendered the entire license agreements void *ab initio*. There followed the (to the court) somewhat illogical argument that failure by plaintiff to "act" after Lear is a separate ground for finding misuse. Defendant took the position that the "defect" could be "cured" . . . "either by a new agreement or by a written agreement striking the offensive limitation". Apparently defendant contends that the defect (and unenforceability) continues until a "cure" has been effected in one of these two ways.

No authority has been cited by defendant in support of its position that some written step is necessary. To this Court, the effect of Lear is the invalidating of the incontestability clauses, the same as if lines had been drawn through them, or they had been erased or physically excised. Lear did not have to deal with our specific issue, as the restraint was implied from the relationship of licensor-licensee. But the Court did not hold that the license agreement was thereby invalidated, but it permitted non-payment of royalties during litigation, and stated that defendant would not have to pay royalties accruing after the attached patent issued "if Lear can prove patent invalidity." (395 U.S. at 674, 89 S.Ct. at 1913). Implicit in this is the right to collect royalties if the patent were held

---

74. Defendant's Brief after trial, pp. 97–98.

75. One of the two reasons expressly stated as the grounds for certiorari in Hazeltine was the question of estoppel of a licensee to question validity (339 U.S. at 830, 70 S.Ct. at 895). While this Court does not question the propriety of the decision in Lear (and it would be immaterial if it did), the flat holding in

Hazeltine will, for the reasons to be stated in the text, be of significance.

76. MacGregor, DX 17, Section 18B; Nissho-Tateno, DX 23, Section XVIII, second paragraph. Each agreement is for a five-year term.

77. Copies of the Court's letter of November 30, 1971, and of the joint reply of January 8, 1972, are filed as part of the record.

to be valid. And see Plastic Contact Lens Co. v. W.R.S. Contact Lens Laboratories, Inc., 330 F.Supp. 441 (S.D.N.Y.1970), and Kraly v. National Distillers and Chemical Corp., 319 F.Supp. 1349 (N.D. Ill.1970).

Defendant has no license; has paid and is paying no royalty; and despite the MacGregor incontestability clause was and is free to contest, and as this litigation shows, is vigorously contesting validity; and did so before Lear was decided.

In other fields the courts have had no difficulty in upholding the validity of the balance of a contract which contained a clause valid when made, but later declared to be invalid.

This has been applied in the field of restrictive covenants. In Terry v. Elmwood Cemetery, 307 F.Supp. 369 (N.D. Ala.1969) the Court held that a provision in cemetery lot deeds limiting interment to Caucasians was void and of no legal effect. The Court did not, however, void the deeds, and gave no intimation that any or all of the deeds had to be physically rewritten or amended, or that confirmatory deeds either striking out or omitting the voided language were necessary. It merely declared that the limitation provisions in the lot deeds "are void and of no legal effect."

In Re Port Publishing Co., 231 N.C. 395, 57 S.E.2d 366, 14 A.L.R.2d 842 (N.C.1950) a collective bargaining agreement contained clauses relating to vacation and severance pay, wages, hours, overtime, vacations and closed shop—all valid when the agreement was made. Later the closed shop provision was outlawed by the North Carolina Legislature. In receivership proceedings the remaining provisions were held to be valid and enforceable. There was no reference to need for excision or reformation.

In National Labor Relations Board v. Rockaway News Supply Co., Inc., 345 U. S. 71, 73 S.Ct. 519, 97 L.Ed. 832 (1953) the agreement in question contained no-strike, arbitration and union security clauses, all valid at the time they were inserted. An employee was discharged for violation of the no-strike clause. The Adjustment Board provided for in the Agreement found against the employee. He then filed a charge of unfair labor practice with the National Labor Relations Board, which found in his favor and ordered his reinstatement. In the meantime the Union security clause had been held to be invalid. The Board held that this made the entire agreement "utterly null and void" (p. 76, 73 S.Ct. 519).

The Supreme Court reversed, holding that there were two obstacles in the way of the Board's complete disregard of the contract. First, that even "if inclusion of a forbidden provision is enough to justify the Board in setting it aside as to the future, it does not follow that it can be wholly ignored in judging events that occurred before it was set aside."

Second, the objectionable feature could be severed, particularly in view of the contract's separability clause. In dealing with this, the Court said in part:

"The employment contract should not be taken out of the hands of the parties themselves merely because they have misunderstood the legal limits of their bargain, where the excess may be severed and separately condemned as it can here." (p. 79, 73 S.Ct. 524)

Substitute "license agreement" for "employment contract", and bearing in mind that misunderstanding "the legal limits of their bargain" required the overruling of a Supreme Court case directed expressly to that point, the above quotation is unusually apt.[78]

---

78. Somewhat analogous is Compania De Inversiones Internacionales v. Industrial Mortgage Bank of Finland, 269 N.Y. 22, 198 N.E. 617, 100 A.L.R.A. 1313 (New York, 1935). Dollar bonds of a foreign corporation payable in this country in gold coin had been called for redemption. The Court held that unenforceability of the clause requiring payment in gold did not invalidate the bonds, but that the holder was entitled to payment in legal tender.

Defendant has failed to prove misuse by plaintiff of the patent in suit, or of plaintiff's patent position.

## INFRINGEMENT

The accused gear is found on six ships of the defendant Grace, of the Santa Lucia class. Five of the ships each have one 80-ton and one 30-ton gear. The sixth has two 80-ton gears.

The infringement problems from a comparison of the accused devices will separately be considered with respect to the 80-ton and the 30-ton gears. Consideration will also be given to the extent, if any, by which the structures of the accused gears have been influenced by knowledge or information of the gear covered by '390. Finally, the significance of Sun's and Grace's appraisal of the accused gear vis-a-vis the Sprengel gear will be considered.

I. *Structure and Operation.*

1. The structure of the 80-ton gear is identical to that of the double pendulum gear of '390 with the following exceptions:

(a) In Sprengel's gear the purchase tackle is led by hauling tackle guide means extending "above the upper end of the boom" to the top of the kingposts, down through the kingposts and thence to the purchase winches.

In the accused structures, the purchase tackle is led from guide sheaves below the topping tackle and below the head of the boom to points near the upper ends of the kingposts and thence downward outside the cargo posts to the purchase winches.

Certain collateral advantages are (as expected) claimed with respect to whether the purchase tackle is led down through or outside of the kingposts. Advantages of having the purchase tackle go down through the kingposts are that the tackle is (largely) protected from sea water and that its emergence from the kingposts can be effected at any point, thus affording almost unlimited selection in the location of the winches on the deck or deck house; or the winches can be located entirely within the kingposts.

In favor of conducting the purchase tackle entirely outside the kingposts it is argued that the tackle is always visible and open for inspection; and that more conventional and cheaper guide blocks can be used.

Were the Court required to choose between these particular features, it would pick the Sprengel locations as more desirable. However, it is not necessary to choose, as the invention relates to the swing through, and not to the disposition of the purchase tackle after it leaves the boom.

Although the claims in suit refer to purchase tackle guide means extending "above the upper end of the boom", it was not, as defendant urges, necessary that this be inserted in the patent application as a limitation in order to secure the issuance of the patent. This is not a case in which claims were rejected because they called for purchase tackle guide means extending below the upper end of the boom, or for failure to specify their location. The claims were granted as originally filed, and there is no file wrapper estoppel.

Nor would the location of the purchase guide means above the upper end of the boom have been of itself a patentable element or ground of distinction. This was already employed in the Fork-type gear of Sprengel.

The Newport News and Lehmann designs had the cargo hauling (purchase) rope running underneath the topping tackle (PX 26, 32, 34).

It was well-known before 1964 that the cargo hauling parts could be satisfactorily installed either above or below a split topping lift.[79]

The testimony on behalf of plaintiff was that guiding the hauling parts below the topping lift accomplishes the same result and functions in the same

---

79. Bebler, PX 123, p. 80.

way as if placed above. It is simply a matter of the designer's choice.[80]

That the "above" or "below" location is not critical is impressively manifested. As a result of conflicts as to whether or not heavy lift gear for the Grace ships had been agreed upon, and if so, what it was, a conference was arranged for March 17, 1965, between Sun, Grace, and Gibbs & Cox, Grace's naval architects. Menko [81] of Gibbs & Cox prepared for and distributed at the meeting a detailed comparison, with comments, of the features of heavy lift cargo gear according to the designs of Sperg, the Fork-type gear, and Sprengel's pendulum block invention. The columnar comparison (PX 69B) lists the various elements of heavy lift gear, with a commentary regarding the differences between them. Nowhere is there any mention of, or comment with respect to, where the lead lines of the cargo hoist were with respect to the toppings—above or below; or as to where they must, or preferably (if there be a preference) should be.[82]

Defendant argues that:

"Not only is defendant's guide structure different mechanically and in its operation, but . . . this was recognized by the Patent Office when it granted the Sperg patent (PX 68)" [83]

Defendant then refers to and quotes from an argument made on behalf of Sperg, pointing out that in his application the hauling parts lie below the topping lift, and do not go into the kingposts.

In this connection it must be remembered:

(i) Defendant's counsel admits that the Sperg patent should not have been granted.[84]

(ii) Whether or not arguments made in the course of the prosecution of a patent are admissible,[85] their relevance here is not obvious. The Sperg patent has never been used!

(b) In Sprengel's rig (Fig. 6 of '390) the purchase tackle hauling parts are guided by a sheave mounted on a turning head which rotates only on a substantially vertical axis. The purchase tackle then passes through an opening up to and across the equalizing sheave.

Defendant employs a universally mounted fair lead [86] for each part of the purchase tackle.

(c) Although the claims do not so require, the pendulum blocks of '390 are independently mounted in practice.

In the Sun rig, the pendulum blocks are jointed together in a "cradle" and cannot move independently. Again, each side claims virtues. Defendant claims its rig is simpler and cheaper.[87] Plaintiff claims that defendant's rig is dangerous.[88]

Merging two elements into one unitary structure would not avoid infringement. Specialty Equipment & Machinery Corp. v. Zell Motor Car Co., 193 F.2d 515, 518 (4 Cir. 1952); imperfect practice of an invention is still infringement. Admiral Corporation v. Zenith Radio Corporation, 296 F.2d 708, 717 (10 Cir. 1961); and an improvement may still infringe. Acme Steel Company v. Eastern Venetian Blind Co., 130 F.Supp. 459, 466 (D.Md.1955); aff'd 227 F.2d 914 (4 Cir. 1955).

In this Court's opinion the 80-ton gear of the defendant, although differing in some physical aspects from that of patent '390 is its equivalent, since it "performs substantially the same

---

80. Sprengel, Tr. 762, 765, 775, 781–2; Bebler, PX 123, pp. 78–80. This "choice" however, is restricted as to '390 to the double pendulum gear.

81. Employed by Gibbs & Cox in its hull outfitting division, and in charge of that division since about 1958.
 Gibbs & Cox was a well-known firm of Naval Architects, acting for Grace.

82. Menko, PX 125, pp. 223–24; 329.

83. Defendant's Brief after trial, p. 29.

84. Tr. 196.

85. Denominational Envelope Co. v. Duplex Envelope Co., 80 F.2d 186, 192–193 (4 Cir. 1935).

86. Guide.

87. Tr. 2281.

88. Tr. 363–7.

function in substantially the same way to obtain the same result." Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147 (1929). The Court continued:

> ". . . Authorities concur that the substantial equivalent of a thing, in the sense of the patent law, is the same as the thing itself; so that if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape".

*Accord,* Wine Ry. Appliance Co. v. Baltimore & O. R. Co., 78 F.2d 312, 318–319 (4th Cir. 1935).

In perhaps the most frequently quoted expression of the doctrine, in Graver Tank & Manufacturing Co. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950), the Supreme Court stated:

> "In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it.

> "But courts have also recognized that to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing. Such a limitation would leave room for—indeed encourage—the unscrupulous copyist to make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law. One who seeks to pirate an invention, like one who seeks to pirate a copyrighted book or play, may be expected to introduce minor variations to conceal and shelter the piracy. Outright and forthright duplication is a dull and very rare type of infringement. To prohibit no other would place the inventor at the mercy of verbalism and would be subordinating substance to form.

> \* \* \* \* \* \*

> "In determining equivalents, things equal to the same thing may not be equal to each other and, by the same token, things for most purposes different may sometimes be equivalents. Consideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform. An important factor is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was.

> "A finding of equivalence is a determination of fact. Proof can be made in any form: through testimony of experts or others versed in the technology; by documents, including texts and treatises; and, of course, by the disclosures of the prior art.

> "Like any other issue of fact, final determination requires a balancing of credibility, persuasiveness and weight of evidence. It is to be decided by the trial court and that court's decision, under general principles of appellate review, should not be disturbed unless clearly erroneous. Particularly is this so in a field where so much depends upon familiarity with specific scientific problems and principles not usually contained in the general storehouse of knowledge and experience." (Id. 607, 609–610, 70 S.Ct. 855).

*Accord,* Specialty Equipment & Mach. Corp. v. Zell Motor Car Co., 193 F.2d 515, 518–520 (4th Cir. 1952); Marvel Specialty Co. Inc. v. Bell Hosiery Mills Inc., 330 F.2d 164, 174–177 (4 Cir. 1964), cert. denied, 379 U.S. 899, 85 S.Ct. 187, 13 L.Ed.2d 175; and Waterproof Insulation Corp. v. Insulating Concrete Corp., 153 F.Supp. 626 (D.Md.1957).

A device infringes where the substance of an inventor's contribution has been appropriated even if practiced

imperfectly. Matthews v. Allen, 182 F.
2d 824, 827–828 (4th Cir. 1950); Baker
Manufacturing Co. v. Whitewater Manu-
facturing Co., 298 F.Supp. 1389, 1397
(E.D.Wis.1969); and Admiral Corp. v.
Zenith Radio Corp., 296 F.2d 708, 717
(10th Cir. 1961).

■ The combination into a single
physical member of two elements called
for by a patent claim does not avoid in-
fringement if the single member per-
forms in substantially the same way the
same functions as the two, nor does the
separation of one member into two, if
the two perform substantially the same
function as the one. Specialty Equip-
ment & Mach. Corp. v. Zell Motor Car
Co., *supra* at 518; Skelton v. Baldwin
Tool Works, 58 F.2d 221, 227 (4th Cir.
1935); Royal Typewriter Co. v. Reming-
ton Rand, 168 F.2d 691, 693 (2nd Cir.
1948), cert. denied, 335 U.S. 825, 69 S.
Ct. 50, 93 L.Ed. 379; Borg-Warner
Corp. v. Mall Tool Co., 217 F.2d 850, 853
(7th Cir. 1954), cert. denied 349 U.S.
946, 75 S.Ct. 875, 99 L.Ed. 1272; and
Zysset v. Popeil Brothers Inc., 276 F.2d
354 (7th Cir. 1960), cert. denied, 364
U.S. 826, 81 S.Ct. 62, 5 L.Ed.2d 54.

2. Sun's 30-ton gear.

In addition to the variations from '390
with respect to Sun's 80-ton gear, men-
tioned above and found not to avoid
equivalence, Sun's 30-ton gear has an-
other, and very significant, difference.

Each of the claims of '390 in suit calls
for a, or a pair of, purchase block fit-
tings, each fitting adapted to have an
upper and a lower purchase block and
associated purchase tackle suspended
from it. Sun's 30-ton tackle (PX 63) has
no upper purchase blocks. Plaintiff ar-
gues that the "function" of the upper
cargo blocks is served by the cross-over
sheave and the guide sheaves. Defend-
ant counters, with far greater persua-
siveness, that the cross-over and guide
sheaves do not perform the function of
the omitted purchase block(s) called for

by the claims. The cross-over and guide
sheaves provide for four parts (of wire)
running to the lower purchase blocks of
the 30-ton rig. The parties are in agree-
ment that this gives a mechanical ad-
vantage of 4:1. This is insufficient for
the heavy loads for which the Sprengel
gear is designed; the upper purchase
block(s) add additional parts in the tack-
le leading to the lower purchase blocks,
and hence an increase of mechanical ad-
vantage.

Plaintiff does not argue that sheaves
can simply be added to the guide blocks
and/or the equalizing sheave of the 30-
ton gear.

■ Defendant's 30-ton rig without
upper purchase blocks is not the equiva-
lent of the rig of '390, and cannot per-
form the heavy lift function of the '390
rig.

II. *Defendant's Knowledge or Infor-
mation as to Sprengel Design.*

As submitted for bids in early 1963,
the specifications for the Santa Lucia
class ships called for heavy lift gear of
the Stulcken fork-type.[89] Sun was the
low bidder, and as early as June 1963,
Sun indicated its desire to substitute
some other gear.[90]

Sun proposed the substitution of
Wiley-Lehmann gear in March 1964, but
Grace rejected it for "operational and
technical reasons" (PX 137A–C).

On June 25, 1964, Sperg first made a
sketch for Sun of his proposed design
for heavy lift gear (PX 92) which did
not have a cross-over sheave (Tr. 1792
ff). On July 27, 1964 Sperg prepared
a drawing of his proposed gear for Sun's
patent attorney.[91] This showed gear
having the upper purchase block sheaves
affixed to the end of the boom, a cross-
over sheave permanently affixed in a
plane perpendicular to the boom's longi-
tudinal axis, and the use of non-articulat-
ing "ears" for the shackles connecting
the topping lift tackle to the end of the

---

89. Menko, PX 125, pp. 28–31; PX 132, par. 1.

90. PX 136, par. 4e.

91. PX 90E, DX 52; Sperg, Tr. 1809–12.

boom. These features appear in the patent drawings (PX 68) and in all of Sun's submissions to Grace and Gibbs & Cox until May 1965.

Sometime in the latter part of 1964, Captain Mohan [92] visited MacGregor's offices and inspected the single pendulum-block model,[93] conceived by Sprengel in September 1963. In September 1964 Atkinson, President of Sun, was shown pictures of models embodying both the single and double pendulum block designs.[94]

Gibbs & Cox expressly rejected Sperg's design in a letter dated October 29, 1964, in which numerous alleged deficiencies were enumerated.[95]

Gibbs & Cox requested that Sun furnish design data regarding the "comparable Stulcken rig" for comparative evaluation, but Sun refused, ostensibly because it did not agree with the criticisms of Gibbs & Cox.[96]

Thereafter Sun on several occasions submitted detailed drawings for the 80-ton and 30-ton gears.[97]

As a result of the failure of Gibbs & Cox to approve any of the Sperg drawings, the March 17, 1965 conference previously described, was held at which the Sperg, Fork and new Stulcken rigs were compared (PX 69 & PX 69B).

Sperg and other Sun draftsmen were then instructed to design boom head fittings which did not have the fixed upper purchase block sheaves which had been criticized by Gibbs & Cox. (Sperg, Tr. 1980–82).

On April 22, 1965, Klewsaat and Korthaus of MacGregor exhibited to Sun personnel, including Zeien, Sun's Vice President of Engineering; Brawner, his assistant; Pavlik, Sun's Chief Naval Architect; Wilkie, Sun's Chief Draftsman of Sun's entire hull drafting department; and five others, a model of Sprengel's gear; still pictures of the single and double pendulum-block type gear, and motion pictures of the M. S. Westphalia; and the differences between the fork-type and pendulum block gear were explained.[98]

Finally, by drawings dated May 12, 1965 and June 22, 1965,[99] Sun's detailed engineering drawings for the boom and boom head fittings for the 80-ton and 30-ton rigs were established in form actually installed on Grace's Santa Lucia line ships.

 Sun's efforts to use gear other than the specified Stulcken fork; Sun's unsuccessful efforts to have the gear shown in the Sperg patent approved; and the modification to a pendulum type gear after exposure to Sprengel's development, all lead to the conclusion, which the Court draws, that the 80-ton gear in fact installed was based upon knowledge of the Sprengel pendulum gear structures.

III. *Sun and Grace's Appraisal of the Sprengel Gear and the Accused Gear.*

1. Pechtel, employed by Sun as a Naval Architect, prepared Sun's instruction manual (PX 150) for the operation

92. After thirty years as an officer in the United States Navy, Captain Mohan was employed by Grace in 1963 as its Assistant Technical Director, and at the end of 1964 or beginning of 1965 he became Technical Director. He "took over the responsibility for coordinating the efforts of the building of the Santa Lucia ships" (PX 124, pp. 3–10, 89).

93. PX 44A–C; Klewsaat, Tr. 1668, 1680–82; Mohan, PX 124, pp. 90–91, 135–36.

94. PX 76F, 76G and 84; DX 80, pp. 35–42; Tr. 1669–73.

95. PX 90, pars. 3, 4, 8 and 9; PX 125, pp. 99–120.

96. PX 90, par. 11; PX 125, pp. 125, 141–6; PX 127, pp. 80–82; PX 125, pp. 140–146.

97. PX 97A, 97C; PX 98A, 98C; PX 73A–C, drawings FF and JJ, dated February 11, 1965; PX 73F.

98. PX 44A–C; PX 76A–H; PX 77A–G; PX 42; PX 87; Tr. 1682–86, 2714; PX 130, p. 25; DX 80, pp. 42–48.

99. PX 55 and PX 57. Remarkably, they are also known as drawings FF and JJ, although they bear no resemblance to the similarly lettered drawings forwarded by Sun on February 11, 1965.

of the heavy lift gear installed on Grace's Santa Lucia Line ships. In this manual (PX 150, January 1966) he copied extensively, pictorially and textually (but without quotation marks or acknowledgment) from the text of and illustrations in plaintiff's brochure (PX 23) entitled "The Stulcken Mast—Over a Deckade of Progress." He admitted using PX 23. (PX 129, p. 9). He characterized Sun's gear as having "one pendulum block fitting . . . on each side of the boom head". (PX 150, p. 7).

There could be no clearer form of recognition that the Sprengel and the Sun 80-ton rigs "perform substantially the same function in substantially the same way to obtain the same result." (Sanitary Refrigeration Co. v. Winters, 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147 (1929)).

2. On December 2, 1965, Captain Mohan wrote to Grace's President, in part as follows:

"On page 7 [of PX 23] is a Stulcken type almost exactly like ours. In some case[s] the Stulcken has one cargo block offset on the boom to permit swinging through without splitting the block. This requires a boom which is stiffened to make up for the torque introduced by the offset block. Stulcken has standardized on a split block— just like ours. *Sun fears a law suit* by Stulcken *since both systems are practically identical. I think Sun got there first*". (PX 131; emphasis added)

Defendant seeks to weaken this damaging admission that the Stulcken and Sun "systems are practically identical" by suggesting: [100]

(a) That Captain Mohan, although Technical Director with "the responsibility for coordinating the efforts of the building of the Santa Lucia ships" (PX 124, p. 89) was not "knowledgable".

No repudiation is of record by Grace of either the propriety of the comparison, or of Captain Mohan's capacity.

(b) That Captain Mohan was comparing the Sperg patent apparatus with that of Sprengel.

It is incredible that Captain Mohan did not know in December of 1965, that the Sperg patent apparatus was not being installed, and was not going to be installed on the Grace lines ships, in view of its repeated non-acceptance by Gibbs & Cox, and the filing on May 12, 1965, of the superseding plans for the gear actually installed (PX 55, also known as GG).

We thus have unqualified recognition, both by Grace and Sun, of the similarity, even the practical identity, of the two rigs.

### CONCLUSION

1. The Court has jurisdiction of the subject matter of this suit, and over the parties.

2. The patent in suit, No. 3,236,390, and claims 1, 2, 3, 14, 15 and 18 thereof are valid.

3. The 80-ton gear installed on the Grace Line Santa Lucia class ships infringes claims 14, 15 and 18 of Patent 3,236,390.

4. The 30-ton gear installed on the Grace Line Santa Lucia class ships does not infringe any of the claims in suit.

5. Plaintiff is not barred from enforcing the patent by misuse of the patent, or of plaintiff's patent position.[101]

6. Defendant's counterclaims are dismissed.

---

100. Defendant's Brief on Infringement, p. 55.

101. Defendant has raised a unique, even weird, defense of estoppel, apparently on the ground that plaintiff should have amended its patent application before issuance, or applied for a reissue, to insert claims that would read verbatim on the accused structures. No authority is cited to support this contention, and the Court is aware of none. Moreover, until the ships were delivered, plaintiff could not be certain of exactly what the gear would be; and some changes were made in the gear after installation. (PX 124, p. 178).

 

7. If the parties are unable to agree upon damages, they are to be assessed through further proceedings.

The foregoing represents the Court's findings of fact and conclusions of law, under F.R.Civ.P. 52(a).

An appropriate decree may be submitted within fifteen days.