## MUTCHNIK *v.* M. S. WILLETT, INC.

[No. 166, September Term, 1974.]

*Decided May 7, 1975.*

*Motion for rehearing filed June 4, 1975; denied June 24, 1975.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Gordon L. Peltz,* with whom were *Shapiro, Peltz & Aversa* and *Albert M. Zalkind* on the brief, for appellant.

*James C. Wray,* with whom were *James H. Langrall* and *Weinberg & Green* on the brief, for appellee.

MURPHY, C. J., delivered the opinion of the Court.

By a "Licensing Agreement" dated June 11, 1968, Melvin Mutchnik and his father, Henry Mutchnik (the Mutchniks), granted M. S. Willett, Inc. (Willett) an exclusive license until June 10, 1978, to manufacture and sell a metal table slide which they had invented and for which they had applied for a patent. For well over a decade prior to the agreement, the Mutchniks had designed and sold various table slides and other furniture items which Willett had manufactured for them. Under their licensing agreement of June 11, 1968, Willett agreed to pay $9,000 to the Mutchniks and to release them from any claims "relating to ... [Willett's] manufacture of the dies for said slide, the tooling in connection therewith and the production of such slides by it, as well as the raw materials, goods in process and finished goods inventories of such slides ... [in Willett's] possession." In consideration of Willett's promise, the Mutchniks agreed to "transfer and assign ... [to Willett] all of their right, title and interest in such dies, tooling, production and inventories." The agreement further specified in paragraph 9 that Willett would:

> "(b) ... pay Licensors [the Mutchniks] ... a royalty of five percent (5%) of the highest gross

invoiced prices charged by Licensee [Willett] and/or its sublicensees for such slides . . . . . *In the event Licensee and/or any of its sublicensees shall manufacture and/or sell any other slides, such royalty shall also apply to and be payable, on the same basis, on the manufacture and/or sale of such other slides.* (Emphasis supplied.)

"(c) The amount of such royalty shall be no less than Five Hundred Dollars ($500.00) per month . . . ."

By declaration filed on January 15, 1973, Melvin Mutchnik, individually, and as assignee of Henry Mutchnik (who died January 1, 1971) sued Willett, alleging that Willett had breached the licensing agreement by failing to make the required royalty payments after May 1, 1969. Willett filed an answer and counterclaim; by way of defense, it asserted that because the agreement was "a patent license, which required royalty payments on items other than those described and claimed in the patent," the agreement constituted "a patent misuse, is illegal and is void *ab initio.*" In its counterclaim, Willett demanded return of all money paid under the agreement and an award for treble, exemplary and punitive damages.

At the trial before the Circuit Court for Baltimore County (Proctor, J. sitting without a jury), Willett's President, John McCaughey, testified that Willett had expended over $40,000 as of June 1968 in the production of dies to produce table slides for the Mutchniks upon the understanding that Willett could only expect to receive $16,000 from the Mutchniks if they purchased the dies.[1] Asked why Willett expended $40,000 on such dies when it knew it could only get back $16,000 from the Mutchniks, McCaughey said that Willett had acted "on our own because we had dealt with . . . [the Mutchniks] for many years and expected to be manufacturing slides for them for an indefinite amount of time." He explained:

---

1. The Mutchniks previously paid $9,000 for dies for table slides produced for them by Willett.

"[W]e found in going into the project we were put in a situation where we had to make them for a certain price regardless of our increased cost. We were willing to go further to try to become more sophisticated in our tooling approach to make the product cheaper, to cut out hourly charges which basically we are saying the labor."

McCaughey testified that even though the dies were costing Willett more than it could hope to recover from the Mutchniks, it expected to make money in the long run "off the production." He said:

"[I]n doing stamping work we don't build tooling to make money. We have to establish a certain price for tooling estimated at the beginning of the project and ask the customer to pay that. Frequently we spend more than we estimate. If we feel the sale of the product will be there we will eventually get it back in the manufacture of the product itself. We were primarily interested in producing stamping, not tooling."

McCaughey testified that beginning in April of 1968, Willett negotiated with the Mutchniks "to form some type of business together"; that in June of 1968, the Mutchniks told Willett that "they had this attorney, Herb Miller, and we had to communicate with him that we should not communicate with them." McCaughey said: "Herb Miller acted like all this was completely new to him at that time. He didn't know us, anything about us, and he had another party he was entertaining an offer from." McCaughey testified that Willett was "put on alert . . . [that the Mutchniks] were dealing with other people" and that on June 10, 1968, a meeting was arranged between Willett and the Mutchniks "to conclude an agreement." McCaughey testified that Willett's attorney and Miller, Mutchniks' attorney, were both present at the meeting; that Miller "basically ran the meeting, brought up point by point what do you think of this, what do you think of that"; and that a written agreement was drafted by Miller in long-

hand "which was basically what had been discussed, and it was signed that night." In signing the agreement on Willett's behalf, McCaughey said, "I felt I had signed what was the best we could get under the conditions."

On this evidence, the lower court concluded that Willett's defense of patent misuse had been sustained. It held that the provisions of paragraph 9 (b) of the licensing agreement, along with other evidence in the case, demonstrated that the Mutchniks would not have executed the agreement unless Willett had agreed to pay royalties, not only on the slides which incorporated the teaching of the patent,[2] but on any other competing slides, whether patented or not. The court said that this constituted an illegal "conditioning" of the grant of the license under the controlling cases rendering the licensing agreement unenforceable. In so concluding, the court noted that the Mutchniks had advised Willett that "someone else [was] interested in a license of the slide patent, and that, inferentially, if . . . [Willett] wanted to get on the bandwagon it had better sign up fast." The court observed that Willett had expended $40,000 in tooling up for the manufacture of the slides, knowing that if it were not granted a license to use the patent, it could only recover $16,000 from the Mutchniks for the dies. Since the Mutchniks knew of these expenditures, and knew that Willett could lose its investment, the court found that the Mutchniks had exercised "leverage" in insisting on the inclusion of the total-sales royalty provision of paragraph 9 (b) in the agreement. From the court's judgment that the licensing agreement was unenforceable, null and void for "patent misuse," Melvin Mutchnik appealed.[3]

The doctrine of patent misuse prohibits extension of a patent beyond the scope of the monopoly granted by the government. In the leading case on the subject, *Zenith Radio*

---

2. A patent had issued for the Mutchniks' table slide on December 31, 1968.

3. The court dismissed Willett's counterclaim. No appeal was taken from that judgment.

*Corp. v. Hazeltine Research, Inc.*, 395 U. S. 100, 89 S. Ct. 1562, 23 L.Ed.2d 129 (1969), the Supreme Court said:

"A patentee has the exclusive right to manufacture, use, and sell his invention. ... The heart of his legal monopoly is the right to invoke the State's power to prevent others from utilizing his discovery without his consent. ... The law also recognizes that he may assign to another his patent, in whole or in part, and may license others to practice his invention. ... But there are established limits which the patentee must not exceed in employing the leverage of his patent to control or limit the operations of the licensee. ... And just as the patent's leverage may not be used to extract from the licensee a commitment to purchase, use, or sell other products according to the desires of the patentee, neither can that leverage be used to garner as royalties a percentage share of the licensee's receipts from sales of other products; in either case, the patentee seeks to extend the monopoly of his patent to derive a benefit not attributable to use of the patent's teachings." 395 U. S. at 135-36.

In *Zenith*, error was found in striking language from an injunction that conditioning the grant of a patent license upon payment of royalties on unpatented products constituted misuse of the patent. The lower court had relied on the holding in *Automatic Radio Mfg. Co. v. Hazeltine Research, Inc.*, 339 U. S. 827, 70 S. Ct. 894, 94 L. Ed. 1312 (1950), that "it is not *per se* a misuse of patents to measure the consideration by a percentage of the licensee's sales." 339 U. S. at 834. In reversing the lower court, the Supreme Court distinguished *Automatic Radio* and reaffirmed its basic holding:

"The Court's opinion in *Automatic Radio* did not deal with the license negotiations which spawned the royalty formula at issue and did not indicate

that ... [the patentee] used its patent leverage to coerce a promise to pay royalties on radios not practicing the learning of the patent. *No such inference follows from a mere license provision measuring royalties by the licensee's total sales* even if, as things work out, only some or none of the merchandise employs the patented idea or process, or even if it was foreseeable that some undetermined portion would not contain the invention. It could easily be, as the Court indicated in *Automatic Radio,* that the licensee as well as the patentee would find it more convenient and efficient from several standpoints to base royalties on total sales than to face the burden of figuring royalties based on actual use. If convenience of the parties rather than patent power dictates the total-sales royalty provision, there are no misuse of the patents and no forbidden conditions attached to the license." (Emphasis added.) 395 U. S. at 138.

Throughout the *Zenith* opinion, the words, "conditioning," "patent power" or "patent leverage" are continually employed by the Court to indicate the object of its condemnation.[4] Moreover, federal courts called upon to apply *Zenith* have held that "conditioning" is a prerequisite to a finding of patent abuse. In *Glen Mfg. Inc. v. Perfect Fit Industries, Inc.,* 420 F. 2d 319 (2nd Cir. 1970), it was said:

"The key factor in determining patent misuse in this situation is whether the licensing agreement containing a total-sales royalty structure is the result of 'conditioning' in the *Zenith* sense; the mere fact of agreement is not determinative." Id. at 321.

In *Beckman Instruments, Inc. v. Technical Development*

---

4. For example, the Court characterized its holding in the following manner:

"We hold that conditioning the grant of a patent license upon payment of royalties on products which do not use the teaching of the patent does amount to patent misuse." 395 U. S. at 135.

*Corp.,* 433 F. 2d 55, 61 (7th Cir. 1970), the court said: "As we understand it, there are two elements in a claim of patent misuse under *Zenith,* namely, conditioning and improper extension of the patent monopoly to cover unpatented products." And in *Blohm and Voss AG v. Prudential-Grace Lines, Inc.,* 346 F. Supp. 1116, 1139 (D. Md. 1972), *rev'd on other grounds,* 489 F. 2d 231 (4th Cir. 1973), the court observed:

> " [T]he Supreme Court made it abundantly clear that what it was condemning was *'conditioning* the grant of a patent license upon payment of royalties on products which do not use the teaching of the patent . . .' . . . (emphasis in original)
>
> "This qualification — conditioning — is repeatedly stated."

In *General Tire & Rubber Co. v. Firestone Tire & Rubber Co.,* 349 F. Supp. 333, 343 (N.D. Ohio 1972), the court said:

> "The fact that royalties are paid on unpatented goods is not the test of misuse. *Automatic Radio Mfg. Co. v. Hazeltine Research* . . . teaches that the test for patent misuse is the purpose and effect of the royalty provision. If the purpose is to enlarge the patent monopoly to cover unpatented goods . . . , it is to be condemned. Where the agreement does not, and was not intended to, result in extension of patent monopoly, as in *Hazeltine,* it is permissible. . . .
>
> ". . . The Court may properly inquire into the alleged misuser's motives behind the arrangement, because 'a purpose to expand the scope of the monopoly must be found.' "

And, at page 344, the court stated:

> "The Court cannot take a surface view of the licensing arrangement and automatically condemn it. There are valid reasons why General may have this provision. Merely to see it in words is not to see it extending monopoly and restraining trade."

618

*See also Chandler v. Stern Dental Laboratory Co.*, 335 F. Supp. 580 (S.D. Tex. 1971); *Carter Products, Inc. v. Colgate-Palmolive Co.*, 164 F. Supp. 503 (D. Md. 1958); Note, *The Patent Misuse Doctrine: A Balance of Patent Rights and the Public Interest*, 11 B. C. Ind. & Com. L. Rev. 46, 57 (1969).

We conclude that the mere insertion of the total-sales royalty provision in paragraph 9 (b) of the licensing agreement in the present case does not prove patent misuse. Plainly, evidence of "conditioning" was required to be shown. In this connection, we think it manifest that the burden of proving its patent misuse defense rested on Willett as the proponent of the issue. *Mobil Oil Corp. v. W. R. Grace & Co.*, 367 F. Supp. 207, 257 (D. Conn. 1973); *Blohm & Voss AG v. Prudential-Grace Lines, Inc.*, *supra*, 346 F. Supp. at 1131. *Compare Crowther v. Hirschmann*, 174 Md. 100, 197 A. 868 (1938).

Whether the court below could properly find from the evidence before it that the Mutchniks conditioned the grant of the license upon the payment of royalties on slides not within the scope of their patent necessitates a determination of what the Court in *Zenith* meant by "conditioning." At one point, the Court defines "conditioning" as "where the patentee refuses to license on any other basis and leaves the licensee with the choice between a license so providing and no license at all." 395 U. S. at 135. Later, the Court characterizes "conditioning" as use by the patentee of the power of his patent "to insist on a total-sales royalty and to override protestations of the licensee that some of his products are unsuited to the patent or that for some lines of his merchandise he has no need or desire to purchase the privileges of the patent." *Id.* at 139. In a similar vein, the Court said: "We also think patent misuse inheres in a patentee's insistence on a percentage-of-sales royalty, regardless of use, and his rejection of licensee proposals to pay only for actual use." *Id.* Additionally, the Court said that "conditioning" involves the use of "patent leverage to coerce a promise to pay royalties on ... [items] not practicing the learning of the patent." Id. at 138.

To sum up, in the words of the United States Court of Appeals for the Second Circuit:

"Relevant criteria in determining whether there was 'conditioning' would include whether the provision was bargained for or imposed and whether the licensee made 'protestations' which were overridden."

*Plastic Contact Lens Co. v. Frontier of the Northeast*, 441 F. 2d 67, 73 n. 10 (2nd Cir. 1971); *Glen Mfg., Inc. v. Perfect Fit Industries, Inc., supra*, at 321.

The record before us is barren of evidence, or inferences properly to be drawn therefrom, of "conditioning" in the *Zenith* sense. At the time the licensing agreement was negotiated, no patent had been issued on the Mutchniks' table slide and at most Willett's bargaining position was influenced by the existence of the pending patent application. There is, however, no evidence that the Mutchniks refused to license on any basis other than a total-sales royalty, or overrode any objections which Willett may have had to the provision, or rejected any alternative proposal which Willett may have advanced. In fact, there is no evidence to indicate that the total-sales royalty provision was ever a bone of contention between the parties, much less demanded or insisted upon by the Mutchniks. That the Mutchniks were aware of Willett's $40,000 tooling-up expenses, and knew that a substantial part of this expenditure could be lost unless Willett was licensed to manufacture the table slide, does not justify drawing an inference that the Mutchniks demanded or insisted, as a condition to their execution of the licensing agreement, that the total-sales royalty provision be made a part of it. Nor does the inclusion of the total-sales royalty provision in the licensing agreement constitute evidence of "conditioning" simply because the Mutchniks made known to Willett that it was negotiating with other parties, and refused to negotiate with Willett except through their attorney. The burden of proving patent misuse — that "conditioning" existed in this

case — was upon Willett; it showed nothing more than that the total-sales royalty provision was included in the agreement. Under *Zenith,* such a showing is plainly not sufficient to demonstrate that Mutchnik used its patent leverage to coerce a promise by Willett to pay royalties on table slides not practicing the learning of the patent.

Willett suggests that *Zenith* holds that charging royalties on unpatented goods constitutes patent misuse with a single exception — where royalties are paid on total sales as a "convenience to the parties." As heretofore indicated, *Zenith* cannot be so narrowly construed. In any event, there was no evidence, one way or the other, with respect to whether the provision was inserted for the convenience of the parties.

Neither is there merit in Willett's reliance upon *Glen Mfg., Inc. v. Perfect Fit Industries, Inc.,* 324 F. Supp. 1133 (S.D. N.Y. 1971), where conditioning and misuse were found. In that case, the evidence plainly showed that the patentee, through use of a standardized total-sales royalty provision employed in numerous licensing agreements over a three-year period, had established a firm policy of refusing to grant licenses unless they contained such provisions. *Id.* at 1136-37.

We conclude, therefore, that the lower court was clearly in error in finding that the Mutchniks had conditioned the grant of the license upon the payment of royalties not within the scope of the patent. Accordingly, we shall reverse the judgment and remand the case for a new trial, limited to the question of the amount of damages due the Mutchniks by reason of Willett's breach of the licensing agreement.

> *Judgment reversed; case remanded for a new trial consistent with this opinion; costs to be paid by appellee.*